TOWNS OF CONCORD, NORWOOD,
AND WELLESLEY, MASSA-
CHUSETTS, Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Boston Edison Company, Intervenor.

No. 90–1619.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 20, 1991.

Decided Feb. 11, 1992.

Charles F. Wheatley, Jr., with whom
Timothy P. Ingram was on brief, for peti-
tioners.

Thomas J. Lane, Attorney, Federal Ener-
gy Regulatory Com'n, with whom William

S. Scherman, General Counsel, and Jerome M. Feit, Solicitor, were on brief, for respondent.

Albert R. Simonds, Jr., with whom Carmen L. Gentile was on the brief, for intervenor.

Before WALD, D.H. GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Towns of Concord and Wellesley, Massachusetts, receive most of their power requirements from the Boston Edison Company. Until 1985, so did the neighboring Town of Norwood. Boston Edison purchased some of its power from regional nuclear power companies. Between 1973 and 1986, those companies imposed on Boston Edison certain charges relating to the storage and disposal of spent nuclear fuel. Boston Edison passed these charges on to the Towns, improperly it concedes, without prior approval from the Federal Energy Regulatory Commission. The Commission nevertheless declined to order a refund of the amounts thus collected, which the ALJ put at $33,720. The Towns contend that the filed rate doctrine rendered refunds mandatory. We sustain the Commission's decision.

## I

■■ The Federal Power Act, as amended, vests the Federal Energy Regulatory Commission with responsibility for ensuring that all rates charged by utilities within the Commission's jurisdiction are "just and reasonable." 16 U.S.C. § 824d(a). The Act requires utilities to "file with the Commission ... schedules showing all rates and charges." *Id.* § 824d(c); *see generally City of Cleveland v. FPC*, 525 F.2d 845, 854 (D.C.Cir.1976). The rates charged may not exceed those on file. *See, e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). Through a "fuel adjustment clause," 18 C.F.R. § 35.14, however, a utility may pass

"on to its customers the increasing cost of fuel [and purchased economic power] without filing a new rate schedule each time the price of fuel [or purchased economic power] rises." *Anaheim v. FERC*, 669 F.2d 799, 806 (D.C.Cir.1981); *accord Public Serv. Comm'n of New Hampshire v. FERC*, 600 F.2d 944, 947 (D.C.Cir.), *cert. denied*, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979). As its name suggests, such a clause adjusts the fuel cost component of a utility's energy charge to reflect deviations in fuel and purchased economic power costs from a base period. 18 C.F.R. § 35.14(a)(1). The Commission has narrowly construed the scope of these automatic charges. *See, e.g., Kansas City Power & Light Co.*, 42 F.E.R.C. ¶ 61,249, at 61,809 (1988). A utility seeking to employ a fuel adjustment clause must provide "detailed cost support for the base cost of fuel and purchased economic power or energy." 18 C.F.R. § 35.14(a)(9)(i). Utilities are limited in what they may include as fuel costs. Purchased economic power is defined to include "all charges incurred in buying economic power," but only if the utility could not have generated the power itself at a lower price. *Id.* § 35.14(a)(11)(i). Similarly, fossil and nuclear fuel costs are limited to items listed in the Commission's Uniform System of Accounts for Public Utilities and Licensees. *Id.* § 35.14(a)(6). Account 518 defines the cost of nuclear fuel as "the net cost of nuclear fuel assemblies"—bundles of thin tubes or rods containing enriched uranium pellets—"plus or less the expected net salvage of uranium, plutonium, and other byproducts and unburned fuel." 18 C.F.R. Part 101.

In order to understand this dispute, it is necessary to go back to a decision by two nuclear power companies, Connecticut Yankee Atomic Power Company (Connecticut Yankee) and Yankee Atomic Power Company (Massachusetts Yankee), to charge Boston Edison and other customers the cost of storing and disposing of nuclear waste they had originally thought would be reprocessed. The two Yankees were owned by a consortium of power companies, including Boston Edison, which held a 9.5 percent

share. Each month the Yankees sent Boston Edison and the other shareholders a bill for cost of service. One of those costs stemmed from maintenance of the reactor core. A nuclear power plant generates energy by inducing chain reactions to split enriched uranium atoms and produce heat. Eventually the enriched uranium loses its ability to sustain a chain reaction and must be replaced with fresh fuel. The "spent" nuclear fuel assemblies continue to generate enormous heat and contain highly toxic radioactive materials. They are stored in steel-lined concrete basins filled with water which absorbs both the heat and the radioactivity generated by the spent fuel.

In the early 1970s, it was thought that the cost of storing and disposing of spent nuclear fuel rods would be offset by the value of the fresh fuel that could be recycled from them. In 1977, however, the Carter Administration banned private reprocessing of nuclear waste in favor of permanent government storage and disposal. Although President Reagan initially lifted this ban, no commercial reprocessing plants ever became operational, and in January 1983 the President signed the Nuclear Waste Policy Act, 96 Stat. 2201, 42 U.S.C. §§ 10101–10226, entrusting the federal government with responsibility for the permanent storage and disposal of spent nuclear fuel.

These changes in national policy forced a change in the Yankees' accounting and billing practices. Originally, they considered spent nuclear fuel an asset because the estimated value of the recycled fuel exceeded the estimated cost of storage and reprocessing. When it became clear that national policy barred reprocessing, spent nuclear fuel became a liability, having a negative salvage value. Accordingly, at some point the Yankees added to their cost-of-service tariffs a charge for spent nuclear fuel disposal costs (SNFDC) from both current and prior reactor cores.

As it did with all other components of the Yankees' cost-of-service bills, Boston Edison passed these charges on to the Towns through a fuel adjustment clause. At first, Boston Edison had no way of knowing that it was doing so. The prior core SNFDC in the cost-of-service bills was not identified by Connecticut Yankee until 1980 and not until 1983 by Massachusetts Yankee. But even after these costs were identified, Boston Edison continued to pass them on through the fuel adjustment clause—according to Boston Edison's testimony, because the charges were so small that no one focused any attention upon them. In any event, the Towns continued to pay for "prior burn SNFDC" until it was fully amortized in December 1986.

About the same time the Yankees probably began charging Boston Edison for prior burn SNFDC, the Commission determined that although such costs might be recoverable through a filed rate, the utilities could not automatically pass such costs through to their customers by way of the fuel adjustment clause. When the Commission first authorized the use of fuel adjustment clauses in connection with nuclear fuel costs in 1974, *Fuel Adjustment Clauses in Wholesale Rate Schedules*, 52 F.P.C. 1304, 1306 (1974) (Order No. 517), it did not explicitly consider the proper treatment of costs like SNFDC. In 1980, however, the Commission determined that prior burn SNFDC could not be passed on through a fuel adjustment clause. As the Commission read its regulations, the fuel adjustment clause incorporated only costs incurred in the current period; prior burn SNFDC is by definition not a current cost. *Florida Power Corp.*, 11 F.E.R.C. ¶ 61,083, at 61,120 (1980); *see also* 18 C.F.R. § 35.-14(a)(1). Later Commission decisions excluded all nuclear fuel storage and disposal costs from the fuel adjustment clause on the ground that the clause was not meant to include estimates of future costs, especially if those estimates were dependent upon changing government policies. *Carolina Power & Light Co.*, 17 F.E.R.C. ¶ 61,-118, at 61,237–38 (1981). As a consequence, the Commission ruled that SNFDC, both from current and prior cores, could only be recovered through regularly filed rates subject to Commission scrutiny and approval. *Virginia Electric & Power Co.*, 15 F.E.R.C. ¶ 61,052, at 61,105 (1981). After enactment of the Nuclear Waste Policy

Act in 1983, the cost of disposing of current core SNFDC came to reflect the price charged by the Department of Energy for permanent disposal. The Commission then reversed itself and allowed fluctuations in current core SNFDC to be passed on to customers through the fuel adjustment clause. *See, e.g., Western Massachusetts Elec. Co.*, 24 F.E.R.C. ¶ 61,278, at 61,574 (1983).

In 1986, the Commission turned its attention to prior burn SNFDC originating in utility-owned companies like the Yankees. The Chief Accountant of the Commission, apparently ignoring the fact that the fuel adjustment clause regulations define purchased economic power as *"all* charges incurred in buying economic power" (18 C.F.R. § 35.14(a)(11)(ii) (emphasis added)), informed several utilities that prior burn SNFDC originating in nuclear power plants owned by them would be treated just like prior burn SNFDC incurred by the utilities themselves. *See, e.g., Bangor Hydro– Electric Co.*, 36 F.E.R.C. ¶ 61,192, at 61,- 486–87 (1986); *Iowa–Illinois Gas & Elec. Co.*, 35 F.E.R.C. ¶ 61,186, at 61,431–32 (1986). Ultimately, the Commission determined that it should end this "contested accounting matter" and avoid "extensive and costly litigation" by encouraging settlement. *Iowa–Illinois Gas & Elec. Co.*, 39 F.E.R.C. ¶ 61,055, at 61,157 (1987). Accordingly, in *Iowa–Illinois*, the Commission urged utilities that had improperly collected SNFDC through their fuel adjustment clauses to come forward within 60 days. It promised that any utility doing so would not be "required to make refunds of the improperly collected amounts" if it could satisfy "a four-part test designed to ensure that the company is not unjustly enriched by the improper collection" and if this would "not otherwise" be "contrary to the public interest." *Id.* (footnote omitted).[1]

In response to this offer, many utilities filed proposed settlements. All settlements were unopposed with the exception of this case in which the Towns challenged Boston Edison's proposal. The ALJ found that Boston Edison had satisfied the *Iowa– Illinois* test. *Boston Edison Co.*, 46 F.E.R.C. ¶ 63,028, at 65,096–98 (1989) [hereinafter "Initial Decision"]. Nonetheless, the ALJ ordered a refund on the theory that failing to do so would be allowing "Boston Edison to violate the Commission's regulations with impunity...." *Id.* at 65,- 099. The Commission rejected this rationale and reversed. *Boston Edison Co.*, 51 F.E.R.C. ¶ 61,019, at 61,042 (1990) [hereinafter "Opinion"]. In their request for a rehearing, the Towns argued, *inter alia*, that if the Commission refused to order a refund, it would violate the filed rate doctrine and the rule against retroactive ratemaking. The Commission responded that in this case there was good cause to waive those doctrines or, alternatively, to waive the fuel adjustment clause regulations. The Commission added that if waiver were improper, it would nevertheless decline to order a refund on equitable grounds. *Boston Edison Co.*, 53 F.E.R.C. ¶ 61,160, at 61,582–83 (1990) [hereinafter "Order Denying Rehearing"].

## II

The phrase "filed rate doctrine" made its Supreme Court debut in *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. at 577, 101 S.Ct. at 2930; *id.* at 599, 101 S.Ct. at 2941 (Stevens, J., dissenting), a case involving the Natural Gas Act, 52 Stat. 821, as amended, 15 U.S.C. §§ 717–717w, which is "in all material respects substantially identical" to the Federal Power Act. 453 U.S. at 577 n. 7, 101 S.Ct. at 2930 n. 7 (quotation omitted). The Court there (*id.* at 577, 101

---

1. The *Iowa–Illinois* test required that the utility: (1) expressly concede[ ] the impropriety of its collection of estimated SNFDC without specific prior Commission authorization in the form of a waiver of the FAC [fuel adjustment clause] regulations; (2) demonstrate[ ] that it did not double-recover SNFDC by including the amounts in its base rates as well as in its FAC;

(3) refund[ ] to its customers its overcollection of SNFDC amounts owed to the Department of Energy (DOE) for fuel burned before April 7, 1983; and (4) demonstrate[ ] that it reduced its rate base for computing rates paid by its wholesale customers for any time in which it held SNFDC collected before payment to DOE. *Iowa–Illinois*, 39 F.E.R.C. at 61,157.

S.Ct. at 2930), and in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* — U.S. —, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990), traced the doctrine's origin to decisions early in this century interpreting the Interstate Commerce Act, such as *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), and *Pennsylvania R.R. v. International Coal Mining Co.,* 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1913). As to the Federal Power Act, the "genesis" of the filed rate doctrine has been identified as *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 251–52, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951). *See Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 962, 106 S.Ct. 2349, 2354, 90 L.Ed.2d 943 (1986); *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. at 599, 101 S.Ct. at 2941 (Stevens, J., dissenting); *City of Cleveland v. FPC,* 525 F.2d at 854 & n. 67. The doctrine generally "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. at 577, 101 S.Ct. at 2930 (citations omitted). Various reasons have been offered in support of the filed rate doctrine, and its corollary prohibiting the regulatory agency from altering a rate retroactively.[2] Most recently, the Court justified the doctrine as necessary to enforcement of the underlying statute (*Maislin,* 110 S.Ct. at 2769), in that case the Interstate Commerce Act. The Court has also described the considerations underlying the doctrine as " 'preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.' " *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. at 577–78, 101 S.Ct. at 2930 (quoting *City of Cleveland v. FPC,* 525 F.2d at 854); *see also Nantahala Power & Light Co. v. Thornburg,* 476 U.S. at 962–63, 106 S.Ct. at 2354–55. Opinions of this court have cited "necessary predictability" as "the whole purpose of the well-established 'filed rate' doctrine...." *Electrical Dist. No. 1 v. FERC,* 774 F.2d 490, 493 (D.C.Cir.1985) (Scalia, J.); *accord Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 577 (D.C.Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990); *Associated Gas Distribs. v. FERC,* 893 F.2d 349, 354 (D.C.Cir.1989). In the context of the Interstate Commerce Act, the Supreme Court has indicated that the doctrine fulfills "the paramount purpose of Congress" of preventing "unjust discrimination." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 417, 106 S.Ct. 1922, 1927, 90 L.Ed.2d 413 (1986) (quotation omitted). Other courts of appeals have described the doctrine as intending "to prevent discriminatory rate payments" (*Cities Serv. Gas Co. v. FPC,* 424 F.2d 411, 417 (10th Cir.1969), *cert. denied,* 400 U.S. 801, 91 S.Ct. 9, 27 L.Ed.2d 33 (1970)); and as "reflecting a statutory bias in favor of retroactive rate reductions but not retroactive rate increases" (*Gillring Oil Co. v. FERC,* 566 F.2d 1323, 1325 (5th Cir.1978)).

■ Whatever the justification, it is generally agreed that with respect to the Federal Power Act, the filed rate doctrine rests on two provisions: section 205(c),[3] which requires utilities to file rate schedules with

---

**2.** The rule against retroactive rate increases prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods. *See, e.g., Columbia Gas Transmission Corp. v. FERC,* 831 F.2d 1135, 1139–42 (D.C.Cir.1987). "The retroactive ratemaking doctrine is thus a logical outgrowth of the filed rate doctrine, prohibiting the Commission from doing indirectly what it cannot do directly." *Associated Gas Distribs. v. FERC,* 898 F.2d 809, 810 (D.C.Cir.1990) (per curiam) (Williams, J., concurring).

**3.** 16 U.S.C. § 824d(c) provides in full:

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

the Commission, and section 206(a),[4] which allows the Commission to fix rates and charges, but only prospectively. Together, these provisions prohibit "a regulated seller of [power] from collecting a rate other than the one filed with the Commission and prevent[ ] the Commission itself from imposing a rate increase for [power] already sold." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. at 578, 101 S.Ct. at 2931. The principal issue in this case is whether, in light of these provisions and the doctrine derived from them, the Commission has any discretion to withhold refunds when it discovers that a utility has imposed charges not in conformity with its rate schedules, or more precisely, when a utility has passed on to its customers, through a fuel adjustment clause, costs incurred but not considered by the Commission to be properly included under the clause. If the Commission does have such discretion, it then becomes necessary to determine whether it exercised that discretion properly.

 The parties frame the question somewhat differently. They say the first issue is whether the Commission may "waive" the filed rate doctrine and its corollary; the Commission itself partly justified its refusal to grant refunds in these terms. It is true, as the Towns point out, that in two cases we have answered a similar question in the negative because in our judgment "waiver" of the filed rate doctrine—actually, the Commission's disregard of it—conflicted with the statutory provisions from which the doctrine originated. *Transwestern Pipeline Co. v. FERC*, 897 F.2d at 580 n. 7; *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 794–97 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 278, 112 L.Ed.2d 233 (1990). But here it is rather misleading to talk of the Commission's "waiving" the filed rate doctrine. To use

Justice Scalia's terminology, waiver means that a right has been "forfeited" by intentional abandonment. *Freytag v. Commissioner*, —— U.S. ——, 111 S.Ct. 2631, 2647 n. 2, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring). Waiver also commonly refers to the loss of a right by failing to invoke it in a timely fashion. *United States v. Pryce*, 938 F.2d 1343, 1351 (D.C.Cir.1991) (Randolph, J., concurring). In the present setting, if the filed rate doctrine gives rise to any right, it is certainly a right of the customer, not of the Commission. The Commission also indicated that it would retroactively "waive" the utility's failure to comply with the fuel adjustment clause. This formulation adds nothing to the analysis. Violations occurred. Following the procedure outlined in *Iowa–Illinois*, which required the utility to concede the "impropriety of its collection of estimated SNFDC" (39 F.E.R.C. at 61,157), Boston Edison confessed. The Commission's reference to "waiver" in this context merely restates its conclusion that the utility's admitted violations in the past did not warrant refunds for the overcharges. What the Towns and the Commission loosely refer to as a waiver is simply the exercise of administrative remedial discretion. Thus, the two rationales—one waiver, the other "equity"—offered by the Commission merge into a single justification in support of its assertion of authority to refuse to order refunds.

As to the existence of remedial discretion, our examination of the Federal Power Act reveals no statutory command mandating refunds when the rate charged exceeds that filed. The Towns do not cite any particular provision in support of such a proposition. The Commission "may," not must, order utilities to refund portions of newly-filed rates or charges later "found not justified." 16 U.S.C. § 824d(e). The

---

**4.** 16 U.S.C. § 824e(a) provides in pertinent part:

Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice,

or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

Commission "may" order a refund if, after finding any rate "unjust, unreasonable, unduly discriminatory or preferential," the Commission fixes a just and reasonable rate for the future; the refund may cover only a limited time and is restricted to the amounts in excess of "those which would have been paid under the just and reasonable rate" fixed by the Commission. *Id.* § 824e(b). As to ordering refunds of amounts improperly collected· in excess of the filed rate, the Commission's authority may also be inferred from section 309 of the Act, which vests the Commission with the power to "perform any and all such acts ... as it may find necessary or appropriate to carry out the provisions of [the Act]" (16 U.S.C. § 825h). *Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153, 158 & n. 18 (D.C.Cir.1967).[5] The power to order refunds has been inferred from the analogous "necessary-or-appropriate" clause in section 16 of the Natural Gas Act, 15 U.S.C. § 717*o. See, e.g., Consolidated Gas Transmission Corp. v. FERC,* 771 F.2d 1536, 1551 (D.C.Cir.1985). With respect to refunds for overcharges, other rate-regulating agencies exercise similar remedial authority. *See, e.g., Public Serv. Comm'n v. Economic Regulatory Admin.,* 777 F.2d 31 (D.C.Cir.1985); *National Insulation Transp. Comm. v. ICC,* 683 F.2d 533 (D.C.Cir.1982); *Las Cruces TV Cable v. FCC,* 645 F.2d 1041, 1047 (D.C.Cir.1981); *Moss v. Civil Aeronautics Board,* 521 F.2d 298, 307 (D.C.Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976); *Williams v. Washington Metro. Area Transit Comm'n,* 415 F.2d 922 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

Invoking the familiar *ubi jus, ibi remedium*—for every right, a remedy—the Towns argue that the Commission is deprived of remedial discretion. In their view, under the filed rate doctrine and the corresponding rule against retroactive rate-making, the Towns have a right to be charged no more than that permitted by the filed rate; therefore, they are entitled to a remedy for Boston Edison's violation. This argument assumes that the "right" ceases to exist unless it is backed up by a remedy, that the Commission's denying refunds equals the Commission's authorizing the utility to violate the filed rate doctrine (or retroactively approving a different rate). This is good advocacy but the case cannot be decided on any such theory. As Justice Holmes warned, "[s]uch words as 'right' are a constant solicitation to fallacy." *Jackman v. Rosenbaum Co.,* 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107 (1922). The Towns possess only the "rights" the Federal Power Act confers, no more, no less. The filed rate doctrine does not have a life of its own. Its application depends on the underlying statute. To ask only whether the filed rate doctrine mandates refunds is to miss an essential part of the inquiry. What says the statute? The Federal Power Act does not explicitly deprive the Commission of remedial discretion with respect to refunds; in fact the Act quite clearly confers it. If refunds must inevitably follow a finding of overcharges under a fuel adjustment clause, the reason must be that in this case some statutory provision or policy, including that implemented by the filed rate doctrine, restricts the Commission's discretion.

This is the meaning we take from the Supreme Court's decision in *Maislin.* That case involved the Interstate Commerce Act, 49 U.S.C. §§ 10101–11917. Like the Federal Power Act, the Interstate Commerce Act requires the entities it regulates to "publish and file with the Commission tariffs," *id.* § 10762(a)(1); unlike the Federal Power Act, the Interstate Commerce Act also explicitly provides that a "carrier may not

---

**5.** The Supreme Court has noted that Congress "withheld from the Commission power to grant reparations." *Montana–Dakota Utils. Co. v. Public Serv. Comm'n,* 341 U.S. at 255 & n. 9, 71 S.Ct. at 697 & n. 9 (citing S. REP. No. 621, 74th Cong., 1st Sess. 20 (1935)). The Court's statement refers only to "the power of the Commission with respect to rates which had become uncondition-

ally effective when filed...." *Public Serv. Comm'n v. FPC,* 329 F.2d 242, 249 (D.C.Cir.), *cert. denied,* 377 U.S. 963, 84 S.Ct. 1646, 1649, 12 L.Ed.2d 735 (1964); *see also Southern California Edison Co. v. FERC,* 805 F.2d 1068, 1071–72 (D.C.Cir.1986); *East Tennessee Natural Gas Co. v. FERC,* 631 F.2d 794, 800–01 (D.C.Cir.1980).

charge or receive a different compensation ... than the rate specified in the tariff...." *Id.* § 10761(a). Congress specified that carriers may charge only their filed rates because it was concerned about discrimination among shippers and the possibility that carriers would intentionally misquote rates to shippers "as a means of offering them rebates or discounts." *Maislin,* 110 S.Ct. at 2766 (citing S.REP. NO. 46, 49th Cong., 1st Sess., 181, 188–90, 198–200 (1886)). In 1989, the ICC announced its *Negotiated Rates* policy forbidding a carrier from collecting its filed rate after the carrier and shipper had privately negotiated a lower one. Observing that it would be difficult to prevent discrimination without strict adherence to the filed rate, the Supreme Court reversed. *Id.* at 2769. Of especial importance to this case, the Court reasoned that "although we agree that the Commission may have discretion to craft appropriate remedies for violations of the statute, ... the 'remedy' articulated in the *Negotiated Rates* policy effectively renders nugatory the requirements of §§ 10761 and 10762 and conflicts directly with the core purposes of the Act." *Id.* The question here is whether the remedy devised by FERC similarly conflicts with the "core purpose[ ]" of the Federal Power Act and therefore constitutes an abuse of discretion.

The case law suggests that it does not. FERC and its predecessor, the Federal Power Commission, have refused to order refunds of charges exceeding any filed rate and imposed before the agency began exercising jurisdiction over transactions previously thought—incorrectly—to be beyond

their regulatory authority. The cases are thoroughly discussed and analyzed in *Borough of Ellwood City v. FERC,* 583 F.2d 642, 646–48 (3d Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1423, 59 L.Ed.2d 634 (1979).[6] There, the court sustained the Commission's refusal to grant a refund despite the customer's objection that failure to order refunds violated the filed rate doctrine. The court ruled that the "purposes of the [Federal Power] Act would not be furthered" by such an order. 583 F.2d at 649. As to concerns about enforcement, the court said in language applicable to this case that "considerations of administrative practicality preclude requiring the Commission to search decades into the past to enforce every failure to comply with the regulatory scheme." *Id.* at 648. An issue of remedial discretion, similar to that posed by this case, also faced the court in *Minnesota Power & Light Co. v. FERC,* 852 F.2d 1070 (8th Cir.1988). FERC found that MP & L had improperly recovered certain charges (attorney fees) through its fuel adjustment clause and ordered the utility to grant refunds to its customers although the litigation in which the fees were incurred had saved the utility's ratepayers millions of dollars. The court remanded the case to the agency so that it could decide whether to exercise remedial discretion—which the court ruled FERC possessed—to refuse "refunds where the costs [passed on to customers through a fuel adjustment clause] were legitimate costs which a utility was otherwise entitled to recover through its wholesale rates." *Id.* at 1073.

---

6. In one of the cases, *Plaquemines Oil & Gas Co. v. FPC,* 450 F.2d 1334 (D.C.Cir.1971), the Federal Power Commission determined for the first time in 1961 that it had jurisdiction over all gas "physically commingled with gas destined for resale in interstate commerce." *Id.* at 1335. Plaquemines conducted business exclusively in Louisiana, but contracted to sell natural gas to the Tennessee Gas Transmission Company which commingled this gas with gas destined for resale in interstate commerce. *Id.* at 1336. While Plaquemines was aware that the Commission had asserted jurisdiction over that sale by virtue of its 1961 ruling, like many other companies it waited to file a tariff until the Supreme

Court upheld the Commission's ruling in 1966 in *California v. Lo–Vaca Gathering Co.,* 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357. In the interim, Plaquemines increased its rates under a contractual escalator clause. The Commission held that because the increase was not properly filed with it, Plaquemines would have to refund the amount collected under it. This court reversed. In light of the Commission's treatment of other utilities brought under its jurisdiction by the 1961 ruling, the court directed the Commission to consider whether the increase was reasonable and fair under the circumstances and to vacate the refund order if it was. 450 F.2d at 1341.

Our decisions invoking the rule against retroactive ratemaking, on which the Towns principally rely, do not suggest that either specific requirements or the core purposes of the Act compel a refund in this case. Those cases stand on an entirely different footing. In both *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791 (D.C.Cir.1990), and *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570 (D.C.Cir. 1990), the Commission sought to impose upon purchasers surcharges representing costs for previously purchased gas even though those costs were not included in the rates then filed and in effect. Thus, in both cases the Commission violated the explicit commands of section 5(a) of the Natural Gas Act, 15 U.S.C. § 717d(a), which requires rate changes to be made prospectively only. Neither case presented an issue regarding the Commission's discretion to order a remedy for a past violation; the pipelines had committed no violations. The Towns also invoke *Public Service Commission of New Hampshire v. FERC*, 600 F.2d 944 (D.C.Cir.1979), but that decision too has no bearing on this case. "The primary issue" there was whether the Commission correctly determined that "imposition of the proposed surcharges would be retroactive ratemaking." *Id.* at 949.

The Towns insist that there is no difference between FERC's authorizing a surcharge for costs not included in the filed rate at the time they were incurred and FERC's allowing a utility to retain charges imposed in excess of its filed rate. This argument recalls previous cases in which we have noted that ordering refunds furthers the purposes underlying the filed rate doctrine and the rule against retroactive ratemaking. *East Tennessee Natural Gas Co. v. FERC*, 631 F.2d at 801; *Belco Petroleum v. FERC*, 589 F.2d 680, 687 (D.C.Cir. 1978). Any assessment of the Commission's refusal to order a refund here must, however, be based upon a considered analysis of the facts of this case and the precise purposes of the filed rate doctrine and rule against retroactive ratemaking. As these doctrines relate to purchasers, their guiding concern is "[p]roviding the necessary predictability," *Electrical District No. 1 v. FERC*, 774 F.2d at 493, allowing "purchasers of gas to know in advance the consequences of the purchasing decisions they make." *Transwestern Pipeline*, 897 F.2d at 577 (citations omitted); *accord Associated Gas Distribs. v. FERC*, 898 F.2d at 810 (Williams, J., concurring); *Columbia Gas Transmission Corp. v. FERC*, 831 F.2d at 1141. Boston Edison's fuel adjustment clause introduced an element of uncertainty into its rates. Nothing in the record suggests that by improperly passing through prior burn SNFDC, Boston Edison undermined the Towns' reasonable expectations or interfered with their economic plans.

Nor is there any reason to suppose that the Commission's refusal to order a refund will undermine its primary jurisdiction over the reasonableness of rates, promote discriminatory rate payments, or in any other manner thwart the core purposes of the filed rate doctrine or of the statute. *See supra* p. 71. Boston Edison did not disregard or evade any of the Act's commands. For the most part, it did not even know that it was passing through the prior burn SNFDC, *see supra* p. 69, and, even if it had, its violation was of the most minor, technical sort. Since the prior burn SNFDC was a component of Boston Edison's purchased economic power, before the Commission's decision in *Iowa–Illinois* it would have had good reason to believe that it could pass those costs onto its customers. 18 C.F.R. § 35.14(a)(11)(ii); *see also supra* p. 70. In short, because of the rather exceptional facts of this case, FERC's refusal to order a refund neither implicates the purposes of the filed rate doctrine nor contravenes any explicit statutory requirement.

The question remains whether the Commission's decision was otherwise reasonable. Customer refunds are a form of equitable relief, akin to restitution, and the general rule is that agencies should order restitution only when "money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it." *Atlantic Coast Line R.R. v. Florida*, 295 U.S. 301,

309, 55 S.Ct. 713, 716, 79 L.Ed. 1451 (1935); *Public Serv. Comm'n v. Economic Regulatory Admin.*, 777 F.2d at 36–38; *cf.* RE-STATEMENT OF RESTITUTION § 1, comment c (1937). Because the "equitable aspects of refunding past rates are ... inextricably entwined with the [agency's] normal regulatory responsibility," *Moss v. Civil Aeronautics Board*, 521 F.2d at 308–09, absent some conflict with the explicit requirements or core purposes of a statute, we have refused to constrain agency discretion by imposing a presumption in favor of refunds. *Public Serv. Comm'n v. Economic Regulatory Admin.*, 777 F.2d at 34–36. The agency need only show that it "considered relevant factors and ... struck a reasonable accommodation among them," *Las Cruces TV Cable v. FCC*, 645 F.2d at 1047, and that its order granting or denying refunds was "equitable in the circumstances of this litigation," *Wisconsin Elec. Power Co. v. FERC*, 602 F.2d 452, 457 (D.C.Cir.1979).

The Commission's decision not to require Boston Edison to refund improperly collected prior burn SNFDC easily satisfies this standard. The Commission focused primarily upon the fact that Boston Edison could not be faulted for passing through most of the costs at issue. Boston Edison simply did not know that the Yankees were charging it for, and that it was passing on to the Towns, prior burn SNFDC. Order Denying Rehearing at 61,583. In *Iowa–Illinois*, the Commission determined that, if its four-part test were met, in most cases a "just and reasonable resolution" would be not to order refunds equal to the costs the utilities unavoidably incurred. Opinion at 61,042 (quoting *Iowa–Illinois*, 39 F.E.R.C. at 61,157). So, the Commission did not start with the ALJ's presumption that it was a brazen violation of the fuel adjustment clause regulations to pass through prior burn SNFDC. Instead, it

recognized this matter to be highly technical, confusing, and still contested and that absent double recovery, overcollection, or some other source of unfairness to customers, there was little potential for unjust enrichment. *Id.* at 61,042; *Iowa–Illinois*, 39 F.E.R.C. at 61,157.[7] Finding no such unfairness in this case and noting the difficulty and the time and expense involved in trying to reconstruct the amount of prior burn SNFDC billed to the Towns by Boston Edison, the Commission refused to order a refund. Order Denying Rehearing at 61,583.

The Towns believe that the Commission's decision undermines enforcement of the Federal Power Act. The Commission obviously disagrees, and we see nothing that would impugn the Commission's conclusion. The Commission has the primary responsibility for deciding matters concerning enforcement. As to the necessity of refunds to deter violations of the statute, the Act leaves this determination to the Commission's expert judgment. Agency discretion is often at its "zenith" when the challenged action relates to the fashioning of remedies.[8] *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d at 159. Here Congress simply directed the Commission to order what it considered "necessary or appropriate" in each case to carry out the statute's commands. The Commission's general policy of granting full refunds remains in effect. *Cf. Illinois Power Co.*, 52 F.E.R.C. ¶ 61,162, at 61,625 (1991). The Towns have offered no reason to suggest that the Commission will fail to honor its policy and we perceive none.

The petition for review is denied.

---

**7.** In *Iowa–Illinois*, the Commission also considered the importance of quickly settling this issue "without the need to resort to extensive and costly litigation." *Iowa–Illinois*, 39 F.E.R.C. at 61,157. Accordingly, it limited its decision to utilities that proposed a settlement within sixty days of the issuance of the opinion. *See id.*

**8.** Often but not always. For instance, the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 10707(d)(1), "provides that a refund is mandatory where the [ICC] finds a rate to be unreasonable after it allows a rate increase to become effective pending its investigation." *National Insulation Transp. Comm. v. ICC*, 683 F.2d at 537.