# United States Court of Appeals
## For the First Circuit

No. 07-2322

JENNY M. GREENWOOD,
Executor of the Estate of Alden T. Greenwood,

Plaintiff, Appellee.

v.

NEW HAMPSHIRE PUBLIC UTILITIES COMMISSION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Circuit Judge,
Tashima,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Mary E. Maloney, Assistant Attorney General, New Hampshire Department of Justice, with whom Kelly A. Ayotte, Attorney General, was on brief for appellant.
Thomas J. Donovan with whom Sarah B. Knowlton, Joel T. Emlen, and McLane, Graf, Raulerson & Middleton, Professional Association were on brief for appellee.

May 15, 2008

    *    Of the Ninth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**.  This case was brought by the owner of a small renewable hydroelectricity producing company, Alden Greenwood, who in 2006 sued the New Hampshire Public Utilities Commission ("PUC") over an order the PUC had issued more than seventeen years earlier in May of 1988 (and declined to reconsider in later orders).  The PUC said it issued the order under section 210 of the Public Utility Regulatory Policies Act ("PURPA" or "the Act") of 1978, 16 U.S.C. § 824a-3.  The 1988 order rescinded the final ten years of a thirty-year (1985-2015) rate schedule which the PUC had earlier approved in an order it issued in 1985.

The district court in 2007 enjoined the PUC from enforcing its 1988 order, in effect reinstating the final ten years of the original rate schedule, which had approved terms favorable to Greenwood in its contract with the Public Service Company of New Hampshire.  Greenwood v. N.H. Pub. Utils. Comm'n, No. 06-cv-270, 2007 WL 2108950 (D.N.H. July 19, 2007).  The underlying amount involved is at least $4.3 million.

We reverse and order dismissal of the case.

I.

In 1978, in the midst of a nationwide energy crisis, Congress passed PURPA, a series of measures designed to reduce the nation's dependence on fossil fuels.  See FERC v. Mississippi, 456 U.S. 742, 745-46 (1982). Section 210 of PURPA sought to "encourage the development of cogeneration and small power production

facilities." Id. at 750; see 16 U.S.C. § 824a-3(a). Congress felt "that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development." FERC, 456 U.S. at 750-51. The Act required the Federal Energy Regulatory Commission ("FERC" or "the Commission") to promulgate rules implementing the statute, in particular, rules requiring utilities to enter into purchase and sale agreements with qualifying cogeneration and small power production facilities ("QFs"). 16 U.S.C. § 824a-3(a); see id. § 796(17)-(18) (defining QFs). These rules, which regulate the rates of purchase and sale, are to be implemented by state utilities commissions. Id. § 824a-3(f)(1); see FERC, 456 U.S. at 751. PURPA requires FERC to prescribe rules exempting QFs from certain state and federal energy regulations. 16 U.S.C. § 824a-3(e); FERC, 456 U.S. at 751.[1]

---

[1]    PURPA also provides an overlapping scheme of federal and state judicial review of state regulatory action taken pursuant to PURPA: federal court review after the exhaustion of a request to FERC for enforcement and state court review of state PUC orders in state court. See 16 U.S.C. § 824a-3(g)(1), (h)(2)(B).

The constitutionality of PURPA, including specifically the role of state agencies in implementing the FERC rules, was upheld by the Supreme Court. See FERC, 456 U.S. at 758-61.

In 1984, in order to "fulfill[] the [PUC's] responsibility under PURPA to set just and reasonable rates for sales of electric power to public utilities," the New Hampshire PUC issued a generic rate order "updating and establishing the short term and long term rates to be paid by Public Service Company of New Hampshire . . . to small power producers and cogenerators." Re Small Energy Producers and Cogenerators (Order No. 17,104), 69 N.H.P.U.C. 352, 353, 356 (July 5, 1984) [hereinafter "Generic Rate Order"].

In August 1985, the PUC approved Greenwood's[2] application under the Generic Rate Order for a thirty-year, long-term avoided cost rate structure, from September 13, 1985 through September 13, 2015, for Greenwood's three 150-kilowatt hydroelectric plants: Waterloom Falls, Otis Falls, and Chamberlain Falls. Alden T. Greenwood d/b/a Alden Eng'g Co. (Order No. 17,814), ___ N.H.P.U.C. ___ (Aug. 13, 1985). All three plants are QFs for the purposes of PURPA. As a result of this rate approval, Greenwood and the Public Service Company of New Hampshire ("PSNH") entered into interconnection agreements under which PSNH agreed to compensate

---

[2] Greenwood died in 2007. His estate was substituted as a plaintiff in the case.

Greenwood for electricity produced by those three plants at the rate provided in the PUC Generic Rate Order and Greenwood's approval order. This meant PSNH would pay Greenwood approximately $0.06 per kilowatt-hour of electricity generated by his three plants in the first year, and that rate would increase each year, culminating in a rate of $0.7174 per kilowatt-hour in the thirtieth year.[3] PSNH would also pay capacity charges increasing from $56.07 per kilowatt-year in the first year to $367.70 per kilowatt-year in the final year.

In May of 1988, the PUC reconsidered its 1985 order. <u>Re Alden T. Greenwood (Order No. 19,095)</u>, 73 N.H.P.U.C. 228 (May 19, 1988). It concluded that it had made a mistake in the 1985 order, and that it had not, as PURPA and the FERC rules required, treated Greenwood's three QFs in a manner "consistent . . . for facilities that are similarly circumstanced." <u>Id.</u> at 229. In addition, its 1985 rate design was "not just and reasonable to the electric consumers of the electric utility and in the public interest, as required by PURPA and the FERC rules." <u>Id.</u> Thus, the PUC's stated reason for altering the earlier order was that it was required to do so to comply with the federal PURPA statute and the FERC regulations. The PUC rescinded the final ten years of the 1985

_____

[3] PSNH is not a party to this litigation. It agreed to be bound by any order relating to the rate at which it is obligated to compensate Greenwood for electricity produced at his three hydroelectric plants because that cost will be included in its own rate base.

-5-

rate order applicable to Greenwood's three plants, reducing it to twenty years. Id. This meant Greenwood lost the previously approved rate for the ten-year period from September 2005 through September 2015 in his contract with PSNH. Greenwood, of course, had no contract with the PUC.

When Greenwood learned of the 1988 rescission order, he moved for reconsideration before the PUC and was given a hearing on November 28, 1988. Following that hearing, the PUC on December 9, 1988 issued Order Number 19,257, denying Greenwood's motion for reconsideration. Re Alden T. Greenwood, d/b/a Alden Eng'g Co. (Order No. 19,257), 73 N.H.P.U.C. 504 (Dec. 9, 1988). Greenwood did not at that time challenge the authority of the PUC to enter the 1988 rescission order. Nor did he claim the order was preempted by or inconsistent with PURPA. To the contrary, the PUC found that at the hearing Greenwood "conceded that the commission had acted within its authority in issuing the rescission order, and did not contest the merits of the order." Id. Accordingly, the PUC let stand its 1988 order rescinding the last ten years of Greenwood's rate order.

Greenwood did not appeal that 1988 decision to the New Hampshire Supreme Court, as he was permitted to do. See 16 U.S.C. § 824a-3(g); N.H. Rev. Stat. Ann. § 541:6. Nor did he petition FERC to bring an enforcement proceeding, see 16 U.S.C. § 824a-3(h)(2)(B), or file suit in federal court asserting that the PUC's

-6-

order was preempted by PURPA, a claim the plaintiff now makes in this suit.

Nearly seventeen years later, on September 15, 2005, as the first twenty years of his rate schedule were about to expire, Greenwood filed a petition with the PUC seeking a declaratory ruling that: (1) the PUC's 1988 rescission order violated the provisions of PURPA and the pertinent FERC regulations; and (2) the PUC's original 1985 approval of his rate schedule remains in full force and effect for its entire thirty-year term. He asserted that PURPA and pertinent FERC regulations divested the PUC of the authority it exercised in 1988 to rescind the Generic Rate Order of 1985. The PUC on April 13, 2006, denied Greenwood's petition, concluding that the doctrine of res judicata prevented him from revisiting the issues the PUC resolved against him nearly seventeen years earlier. Re Alden T. Greenwood dba Alden Eng'g Co. (Order No. 24,613), 91 N.H.P.U.C. 170 (Apr. 13, 2006).

Greenwood moved for reconsideration, asserting that res judicata was inapplicable because the PUC had lacked the authority in 1988 to act as it did. On June 22, 2006, the PUC rejected that argument, concluding that Greenwood had waived his right to pursue his claim in a federal forum and had voluntarily submitted himself to the jurisdiction of the PUC. Re Alden T. Greenwood dba Alden Eng'g Co. (Order No. 24,638), 91 N.H.P.U.C. 283 (June 22, 2006). Greenwood did not appeal that decision to the New Hampshire Supreme

-7-

Court.  Instead, Greenwood filed a petition for declaratory and injunctive relief in federal court on July 21, 2006.

## II.

Plaintiff brought this suit, asserting general federal question jurisdiction under 28 U.S.C. § 1331.  The suit claims that the four PUC orders, from the 1988 rescission order on, were expressly preempted by PURPA section 210(e), 16 U.S.C. § 824a-3(e), and FERC's implementing rules, 18 C.F.R. §§ 292.601, 292.602.  The four orders are (1) the 1988 order which modified the 1985 rate order by limiting Greenwood's rate to twenty years from the original thirty years; (2) the 1988 order upholding that decision after a hearing on Greenwood's petition for reconsideration, (3) the 2006 order denying Greenwood's petition for declaratory judgment on the basis of res judicata, and (4) the 2006 order denying Greenwood's motion for reconsideration.

The district court, in a written order on July 19, 2007, granted summary judgment to plaintiff and enjoined the PUC from enforcing its 1988 order and the subsequent orders denying reconsideration.  Greenwood, 2007 WL 2108950, at *11.  Thus the court's 2007 order effectively reinstated the final ten years of the original 1985 rate order, favorable to Greenwood, which the PUC had rescinded in 1988.  The court held that PURPA divested the PUC of authority to issue the 1988 rescission order, and consequently,

-8-

since the 1988 rescission order was void ab initio, res judicata did not bar the plaintiff's claim.  Id. at *9.

The district court also held that, even though plaintiff had waited over seventeen years after the 1988 orders were issued to file suit, the statute of limitations had not yet run.  Id. at *10.  The court viewed the most analogous statute of limitations to be a contract limitation period, subject to the doctrine of anticipatory repudiation.  Because the 1988 order affected only the last ten years of Greenwood's rate schedule, namely the period between September 2005 and September 2015, "Greenwood could have treated the PUC's rescission order as a sort of anticipatory repudiation of its obligations to him," and brought suit at any point before September 2006.  Id.  The court rejected the PUC's laches defense, finding that plaintiff's delay was not unreasonable, that the PUC had not suffered any prejudice as a result of the delay, and that the PUC itself had not acted with "clean hands."  Id.

### III.

In its complaint, the plaintiff asserted subject matter jurisdiction under 28 U.S.C. § 1331.  The PUC in its answer originally did not dispute that federal question jurisdiction under 28 U.S.C. § 1331 exists, and the district court did not, under those circumstances, inquire further.  At oral argument, we asked the parties to submit supplemental briefs on the question of

-9-

whether the district court had jurisdiction over Greenwood's claim. The question was whether PURPA section 210 required exhaustion of remedies before FERC, which admittedly did not occur, as a prerequisite to filing suit.  See 16 U.S.C. § 824a-3(h)(2)(B).

While we would ordinarily reach the jurisdictional question first, we choose to resolve this case on other grounds. Although the Supreme Court in Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998), generally barred the practice of "hypothetical jurisdiction," this circuit has treated Steel Co.'s admonition as having limits.  See McBee v. Delica Co., 417 F.3d 107, 127 (1st Cir. 2005); Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys., 173 F.3d 46, 53-56 (1st Cir. 1999).  This court has consistently interpreted the Steel Co. rule as applying in its strict form only to issues going to Article III requirements.  See McBee, 417 F.3d at 127.  Here, where any concerns over jurisdiction are a matter of statutory interpretation and not an Article III issue, we may bypass the jurisdictional inquiry.  See, e.g., id.; Cozza v. Network Assocs., 362 F.3d 12, 15 (1st Cir. 2004); Restoration Pres. Masonry v. Grove Europe Ltd., 325 F.3d 54, 59-60 (1st Cir. 2003); United States v. Woods, 210 F.3d 70, 74 n.2 (1st Cir. 2000); Parella, 173 F.3d at 53-56.

A.      Statute of Limitations

We hold the suit is barred by the statute of limitations. First, Greenwood's seventeen-year delay in challenging the 1988

-10-

order does not comply with the applicable limitations period. Where, as here, the federal statute contains no statute of limitations, the court should apply the most analogous statute of limitations in the state where the action was brought. Wilson v. Garcia, 471 U.S. 261, 266 (1985); accord Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 138 (1st Cir. 2005). The determination of the most analogous statute of limitations is an issue of law, which we review de novo. Doyle v. Huntress, Inc., 513 F.3d 331, 335 (1st Cir. 2008); Villanueva-Méndez v. Nieves-Vázquez, 440 F.3d 11, 15 (1st Cir. 2006).

Greenwood's claim is most analogous to a New Hampshire law claim of tortious interference with contractual relations, that is, that the PUC rescission order interfered with Greenwood's advantageous contractual relationship with PSNH. Such a claim is governed by New Hampshire's general three-year statute of limitations. N.H. Rev. Stat. § 508:4 ("[A]ll personal actions . . . may be brought only within 3 years of the act or omission complained of . . . ."); see also Singer Asset Fin. Co. v. Wyner, 937 A.2d 303, 312 (N.H. 2007).

Tortious interference with contractual relations requires the plaintiff to show: "(1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was

-11-

damaged by such interference." Singer Asset Fin. Co., 937 A.2d at 312 (quoting Hughes v. N.H. Div. of Aeronautics, 871 A.2d 18, 28 (N.H. 2005)) (internal quotation marks omitted). See generally Restatement (Second) of Torts § 766. Greenwood did not have a contractual agreement with the PUC; rather, Greenwood had a contract with a third party, PSNH, which the PUC approved. The PUC regulated the relationship between the PSNH and Greenwood, but was not itself a party to Greenwood's and PSNH's contract. Thus, when the PUC modified the rate order, it did not breach an agreement that the PUC had entered into with Greenwood, but instead modified the last ten years of rates in an agreement between Greenwood and PSNH. Because Greenwood contends that the PUC improperly interfered with an agreement he had with PSNH, an action for tortious interference, and not a breach of contract, is most analogous to the instant action.

It is also clear that this claim accrued in 1988. "Although the limitations period is determined by state law, the date of accrual is a federal law question." Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997). Federal law incorporates "the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action.'" Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007) (quoting Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp., 522 U.S. 192, 201 (1997)); see also Rodríguez-García v. Municipality of Caguas, 354

F.3d 91, 96-97 (1st Cir. 2004) ("[A] limitations period begins to run when the plaintiff 'knows or has reason to know of the injury which is the basis for his claim.'" (quoting Rodriquez-Narvaez v. Nazario, 895 F.2d 38, 41 n.5 (1st Cir. 1990))).

Greenwood's claim accrued in 1988 when the PUC turned away Greenwood's challenge to its revision of its 1985 order. Greenwood both knew of his injury in 1988 and, in his submissions to the district court, acknowledged that he had suffered two concrete harms in 1988: the cut in the anticipated stream of income for the last decade of the rate order and the reduction in the resale values of the power stations. Therefore, the three-year limitations period began running in 1988, but no action was brought until 2005.[4]

Plaintiff asks us instead to find that plaintiff's claim is most analogous to a breach of contract action, and that under the doctrine of anticipatory breach of contract, the three-year statute of limitations would not begin until September 2005. We do not reach the question of whether, if this were a contract action, the anticipatory breach of contract doctrine would apply in these circumstances to extend the limitations period. See State Employees' Ass'n v. Belknap County, 448 A.2d 969, 973 (N.H. 1982) (noting that, under the doctrine of anticipatory breach, a

---

[4]    Nothing is added to the plaintiff's claim by the attacks on the PUC's later orders denying Greenwood's attempts to vacate the 1988 order.

plaintiff may elect to bring suit at any time between the other party's stated intention to breach the contract and the date that the other party actually becomes obligated to perform a specific duty under the contract).  Here, the claim is not analogous to a breach of contract action.  There was no contract between the PUC and Greenwood, and Greenwood does not claim that the PUC breached any sort of agreement.[5]

B.        Equitable Considerations

We also note that even if there were any doubt about the statute of limitations having expired (and we find none), the plaintiff's claim for injunctive relief calls upon the equitable powers of the federal court, and it would be inherently inequitable to allow this action to go forward and for any relief to be issued.[6]  "The principle that the passage of time can preclude relief has deep roots in our law, and [courts] ha[ve] recognized this prescription in various guises." City of Sherrill v. Oneida Indian Nation, 544 U.S. 197, 217 (2005).

---

[5]     For the same reasons, we reject plaintiff's argument that the statute of limitations is tolled because the rate order is akin to an installment contract.

[6]     The record contains no evidence that the PUC engaged in any inequitable "acts [that] in some measure affect the equitable relations between the parties." Dr. José S. Belaval, Inc. v. Pérez-Perdomo, 488 F.3d 11, 15 (1st Cir. 2007) (quoting Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995)) (internal quotation marks omitted).  Even if the PUC acted inequitably, that would not lead us to disregard the harm to third parties, including consumers.

-14-

In this area of law, FERC itself considers the plaintiff's delay in bringing suit in deciding whether or not to pursue an enforcement action under the federal enforcement scheme set out in section 210. "The appropriate time to challenge a state-imposed rate is up to or at the time the contract is signed, not several years into a contract which heretofore has been satisfactory to both parties." Conn. Light & Power Co., 70 F.E.R.C. 61,012, 61,029 (1995); see Town of Concord v. FERC, 955 F.2d 67, 76 (D.C. Cir. 1992); see also S. Cal. Edison Co., 70 F.E.R.C. 61,215, 61,678 (1995) ("We believe that the appropriate time in which to challenge a state-imposed rate for a QF purchase is up to the time the purchase contract is signed, not years into a contract.").

These orders bear a direct relationship to power costs, not only for the generators and the regulators but also for the distributors, investors, and for the public consuming the energy. Cf. N.Y. State Elec. & Gas Corp., 71 F.E.R.C. 61027, at *14 (1995) (denying relief when petition presented "no legitimate reason . . . to upset long-term contracts . . . which were the basis for the financing and construction of the QF projects and under which the parties have been providing and paying for service").

There is ample unrebutted evidence in the record of the prejudicial effect on third-party consumers of Greenwood's delay in bringing this suit. The PUC submitted the affidavit of Steven E.

-15-

Mullen, a PUC utility analyst, which estimated the total cost difference at issue to be at least $4.3 million over the ten-year period.[7]

The PUC points out that PSNH will likely pass on the costs of any judgment for Greenwood to its customers. Because its customers from the period between the end of the modified rate order in 2005 and the entry of judgment are not necessarily the same customers as those after the entry of judgment, those new customers would be paying additional costs for electricity they did not necessarily use.

Given the extent of this reliance and the need for stability, it is inherently unreasonable to permit a producer to wait seventeen years to bring a preemption challenge to a state rate order. It is even more inequitable to do so where a producer earlier brought a timely partial challenge to a rate, did not then raise a preemption challenge, and did not pursue judicial review.

_____

[7] The cost differential stems from both the cost of the electricity itself as well as capacity charges owed Greenwood under the original 1985 rate order. From the period since the end date of the modified rate order in 2005 until 2006, PSNH compensated Greenwood an average of $0.06 per kilowatt-hour, which was approximately one-sixth the original 1985 rate order's rates for 2006. PSNH also stopped paying Greenwood capacity charges after the end of the modified rate order, and the original 1985 rate order would have required PSNH to pay capacity charges of $205.12 per kilowatt-year in 2006. Given the difference between market rates and the rates set out in the original order, a cost differential would likely persist until 2015, the final year of the original order.

Federal law has changed in the intervening years to recognize the significant economic impact on utilities of the mandatory obligations to purchase and sell electricity to QFs. The Energy Policy Act of 2005 ends the mandate for an electric utility to enter into new contracts with QFs to purchase or sell electricity upon a finding by FERC that the QF has non-discriminatory access to the market. Pub. L. No. 109-58, § 1253(a), 119 Stat. 594, 967-970 (2005); 16 U.S.C. § 824a-3(m). (Existing contracts are not affected. 16 U.S.C. § 824a-3(m)(6).)

The judgment of the district court is reversed, and the case is ordered dismissed with prejudice.