United States Court of Appeals,

Fifth Circuit.

No. 92-4066.

TRANSCONTINENTAL GAS PIPE LINE CORPORATION, et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Aug. 27, 1993.

Petitions for Review of Orders of the Federal Energy Regulatory Commission.

Before REYNALDO GARZA, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Transcontinental Gas Pipe Line Corporation ("Transco") appeals an order of the Federal Energy Regulatory Commission ("the Commission" or "FERC") finding that Transco violated the Natural Gas Act ("NGA") and refusing to allow Transco to pass through $75 million to some of its customers. Several of Transco's customers have intervened, urging us to restructure the remedy the Commission crafted. We decline to do so and affirm the Commission's order in all respects.

I.

This case has at its roots the changes that occurred in the natural gas industry in the 1970's when interstate pipelines started to curtail service upon entering into long-term purchasing agreements. In 1978, Transco signed long-term contracts to buy gas from its producers. The contracts included "take-or-pay" provisions that obligated Transco either to take delivery of an amount of gas or to pay for that amount even if Transco did not take delivery.

In the early 1980's, the price of gas declined. Transco still was bound to take or pay for gas at prices well above the market rate. The Commission's regulations required Transco to charge all customers the same price for gas, computed by averaging the cost of all gas Transco purchased; this is called the weighted average cost of gas purchased for resale ("WACOG"). Partly because of Transco's take-or-pay contracts, its WACOG was higher than the price of alternative fuels or gas available on the spot market. As a result, Transco started to lose customers, called "non-captive"

customers, who could shift to alternative fuels or buy on the spot market. Customers without access to lower-priced alternatives, who had to continue to purchase WACOG fuel at a rate filed with the Commission, were called "captive."

In the mid-1980's, the Commission started encouraging pipelines to devise new ways to combat their declining sales. In response, Transco set up a program, called a Special Marketing Program, that the Commission approved—on a temporary, experimental basis—in 1983. Under this program, Transco released gas subject to high take-or-pay requirements for sale on the spot market. Transco then could transport the market-priced gas to non-captive customers. In 1984, the Commission conditioned the extension of the program on Transco's agreeing to grant captive customers some access to cheaper gas, up to ten percent of the maximum volume of gas that the captive customers could demand.

Not completely satisfied with the Commission's conditions, Transco proposed its own Discount Service Program instead. Under this program, all customers could buy up to three percent of their required gas at market prices and then buy an additional seven percent at market prices if they purchased a "threshold level" of Transco's more expensive system supply gas. The Commission approved Transco's Discount Service Program in March 1985, stipulating, however, that the plan not go into effect until the United States Court of Appeals for the District of Columbia Circuit permitted Transco to carry out the program.

When the District of Columbia Circuit had not acted by April 1985, Transco, without the Commission's approval, decided to implement a variation of its Discount Service Program by creating two subsidiaries, Transco Resources, Inc. ("TRI"), and Transco Energy Marketing Co. ("TEMCO"), to sell more of its excess gas to non-captive customers at the market rate instead of at Transco's filed rate of $3.01 per Dth.[1] Transco used TRI to sell gas from April until October 1985, and TEMCO

---

[1]Dth = Decatherm, a measure of gas based upon its heat content. One decatherm equals 1,000 cubic feet of gas with the standard heat content. *Columbia Gas Transmission Corp. v. FERC,* 848 F.2d 250, 251 n. 1 (D.C.Cir.1988).

from June until November 1985.[2]

Transco arranged for TRI to prepay producers at spot market prices from revenues obtained from TRI's sale of gas from the Transco system supply. In exchange, the producers released gas to TRI that had been contracted for by Transco. TRI later returned some volumes of gas to Transco and bought and sold gas from the spot market to non-captive customers. From April until August 1985, TRI sold gas at an average price of about $2.55 per Dth, $.46 below Transco's filed rate charged to captive customers.[3] From April through July 1985, TRI sold more gas each month than it purchased.

TEMCO operated in a similar fashion. Transco also set up TEMCO to sell gas to non-captive customers at market-responsive prices, a function Transco could not perform under the NGA. TEMCO concurrently sold and prepaid for gas at market rates that Transco released from its pipeline. TEMCO sold this gas before the producers actually produced any gas. From June until November 1985, TEMCO sold gas to non-captive customers at an average price of about $2.23 per Dth. During this time, TEMCO sold more gas than it purchased, creating what Transco termed a "transportation imbalance," the difference between receipts and deliveries under a transportation agreement.

Transco would have faced a large underrecovery had it set up TRI and TEMCO to repay Transco in cash for the gas they sold at the market rate. To avoid such a loss, Transco arranged for its subsidiaries to repay Transco in gas. Transco then sold this gas to its captive customers at the filed rate of $3.01 per Dth, despite the fact that TRI and TEMCO had originally paid market rates of between about $2.23 and $2.55 per Dth for this gas. Transco thus created an inflated differential between its actual and projected costs. This showed up as a projected under-recovery in the spring

[2]In May 1985, the District of Columbia Circuit issued its opinions in the *Maryland People's Counsel* cases. In *Maryland People's Counsel v. FERC,* 761 F.2d 768 (D.C.Cir.1985) ("*MPC I* "), *Maryland People's Counsel v. FERC,* 761 F.2d 780 (D.C.Cir.1985) ("*MPC II* "), and *Maryland People's Counsel v. FERC,* 768 F.2d 450 (D.C.Cir.1985) ("*MPC III* "), the court disallowed a special marketing program approved by FERC, one very similar to Transco's, stressing that it unduly discriminated against captive customers by denying them the same access to lower-priced gas that non-captive customers enjoyed.

[3]Actually, most of the captive customers paid slightly below the filed rate because they had access to at least three percent of their gas at the market rate.

of 1986 of $81.3 million.

Transco's filed rate of $3.01 per Dth was based upon projected costs calculated in early 1985. It turned up the $81.3 million underrecovery when it figured its actual costs. These figures allegedly revealed that Transco really paid about $3.30 per Dth for the gas it sold in 1985 and 1986. Under the Commission's regulations, Transco was allowed to seek recovery of the difference between the rate it collected and its actual costs by imposing a surcharge on its customers.

In April 1986, Transco requested the Commission to allow it to recoup a $75 million "passthrough."[4] The Commission permitted Transco to collect the refund, on a deferred basis, subject to Transco's refunding whatever it collected upon the outcome of hearings on the propriety of the amount. Transco collected about $48.5 million before the Commission issued its final order.

An administrative law judge ("ALJ") issued an initial decision (called Phase I), addressing only the issue of liability, on August 29, 1988,[5] concluding that Transco and its affiliates, TEMCO and TRI, should be viewed as a single entity. Accordingly, sales by TRI and TEMCO were sales by Transco, below-cost sales in violation of the filed rate requirements of section 4(d) of the NGA, 15 U.S.C. § 717c(d).[6] Because some of these sales were to customers to whom Transco did not have

---

[4]In a May 1986 offer of settlement, Transco proposed to limit its recovery to $75 million, rather than $81.3 million.

[5]In February 1987, another ALJ had issued a decision purporting to resolve the case. In September 1987, FERC remanded to a different ALJ for a more thorough development of the record.

[6]Section 4(d) provides,

> Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulations, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

authorization to sell, it violated section 7(c) of the NGA, 15 U.S.C. § 717f.[7]

The ALJ based his single entity determination upon the fact that the composition of the corporate hierarchies of the TRI, TEMCO, and Transco were almost identical. All of TRI's officers, and all except for one of TEMCO's officers, also were Transco officers. Six of TEMCO's seven directors were directors at Transco. TRI, TEMCO, and Transco all had the same address. TRI had no employees, and TEMCO had but eighteen employees, all of whom were former Transco employees. Corporate distinctions were ignored in dealings among the three groups, and no legal instruments governed transactions among the three groups.

The ALJ next determined that the transactions at issue were sales, not "transportation imbalances." Defining a sale as the "transfer of title for a price" (in accord with U.C.C. § 2-106(1)), the ALJ found that one company (Transco through TRI and TEMCO) simply transferred its gas to customers in exchange for money. The ALJ concluded that Transco deliberately used TRI and TEMCO to circumvent the filed rate requirements of section 4(d) of the NGA. He refused to allow a company bound by a filed rate to create a subsidiary to sell gas at lower rates.

The ALJ finally found that Transco discriminated against captive customers by providing access to lower-price gas only to non-captive customers. The ALJ determined that Transco had not met its burden of proving that the discrimination was not "undue" within the meaning of section 4(b) of the NGA, 15 U.S.C. § 717c(b),[8] and Transco had not shown that discriminatory pricing was the only way to lower prices.

On December 15, 1989, the ALJ issued a decision on remedies, called Phase II. First, the ALJ adopted part of a remedy suggested by a Commission accountant, Robert Fulton, who recalculated

---

[7]Section 7(c) prohibits a gas company from selling gas in interstate commerce for resale without an outstanding certificate.

[8]Section 4(b) provides,

> No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

Transco's costs using the actual spot market prices TRI and TEMCO had paid instead of the $3.01 rate Transco claimed. This recalculation showed that Transco underrecovered about $2.6 million, not $81.3 million. Since Transco already had agreed to lower its claim from $81 million to $75 million, effectively foregoing $6.3 million, Fulton's recalculation reduced Transco's claim to zero.

The ALJ ordered Transco to refund the $48.5 million passthrough it already had collected, finding that the recalculation remedied Transco's violation of forcing its captive customers to subsidize the illegal, market-price sales to non-captive customers. All customers that had paid the passthrough would receive these refunds.

The ALJ based the second part of the remedy upon a proposal by a Commission auditor, Gloria Halstead, who suggested a refund of about $26 million[9] of profits that Transco had realized on the transportation of gas that it had sold illegally. She urged that Transco pay $15.7 million to customers who had paid an average price for gas above the average price of all gas sold by Transco, TEMCO, and TRI. She then urged that Transco refund the remaining $10.3 million *pro rata* to all captive customers.

On September 12, 1990, the Commission issued an order affirming the ALJ's decisions. First, the Commission affirmed the ALJ's finding that the contested transactions were sales, not transportation imbalances. The Commission reasoned that the transactions had "all the hallmarks of a sale," that Transco had developed and operated the affiliates solely as a vehicle to sell discounted Transco gas, and that while Transco's transportation tariff required the elimination of imbalances within thirty days, the imbalance at issue lasted thirteen months. The Commission also concluded that the ALJ correctly had relied upon the *MPC* cases in finding that Transco could not justify its discriminatory pricing.

Finally, the Commission determined that the ALJ properly imposed remedies. They were not penalties, nor did they deny Transco its right to recover its costs. The disgorgement simply forced Transco to surrender "profits realized in the transportation of gas that was sold under conditions that

---

[9]After calculating interest, this amount becomes about $36 million.

were unduly discriminatory and not sold at the pipeline's filed sales rate."[10] The Commission also denied Transco's request for oral argument.

At some point in late 1990 or early 1991, one of Transco's attorneys asked the Commission's General Counsel to hear oral argument on Transco's motion for rehearing of the September 15, 1990, order. Oral argument was heard on April 16, 1991.

On January 15, 1992, the Commission issued its order on rehearing, affirming part of its previous order but reversing part as well. Specifically, the Commission affirmed its previous determination that Transco had violated sections 4(b), 4(d), and 7(c) of the NGA because the transactions in question were not certificated, were below the filed rate, and were unduly discriminatory. The alleged benefits of the transactions and the circumstances affecting the gas industry at the time did not overcome the unduly discriminatory nature of the transactions. Moreover, Transco made no showing that the alleged benefits could not have been attained through non-discriminatory pricing.

The Commission then addressed the remedies. It first retained the remedy requiring Transco to forego recovery of $75 million in unrecovered gas costs because the remedy was "closely related" to the illegal sales. Since Transco had calculated its $75 million in unrecovered costs by using only Transco's WACOG, once the ALJ found that Transco, TRI, and TEMCO were but one company, Transco had to compute its WACOG as that of TRI, TEMCO, and itself. Because this yielded unrecovered costs that were $78.6 million lower than claimed, Transco was not entitled to any recovery and had to refund the $48.5 million it already had collected. The Commission once again rejected Transco's argument that its sales method inflicted no harm, finding instead that all customers were harmed because they all eventually paid $3.01 per Dth for gas that had cost less.

The Commission, however, reversed itself on another part of the remedy, eliminating the requirement that Transco disgorge the $26 million in profits from transportation revenues (the Halstead remedy), reasoning as follows:

---

[10]The ALJ also denied Transco recovery of $853,000 in costs associated with sales by its subsidiaries to non-captive customers and ordered Transco to refund that amount. FERC eliminated this part of the remedy.

> Any further equitable remedy is unnecessary, particularly in light of the market circumstances and industry-wide problems under which Transco acted.... At the remedial stage of a proceeding the Commission exercises its discretion to take into account a broader range of factors, including equitable circumstances, than it does at the violation stage.... [T]he primary reason for limiting the remedy to the recalculation of the allowable unrecovered gas costs is a recognition of the circumstances at the time....

Finally, the Commission discussed its decision to hear oral argument in the case. It found that even if Transco's attorney's oral request for oral argument was considered an *ex parte* communication, it caused no harm. All parties were allowed to argue; no party requested rehearing of the order setting oral argument. Two dissenting commissioners found that since the communication was procedural in nature, unrelated to the merits, it was not an *ex parte* communication.

Several of Transco's customers, including North Carolina Utilities Commission ("NCUC") and Long Island Lighting Company ("LILCO"), filed motions urging rehearing of the Commission's January 15 order. NCUC objected to the elimination of the $26 million transportation revenue remedy. LILCO objected to the elimination of the allocation scheme that would have refunded more than a *pro rata* share of refunds to captive customers most affected by price discrimination. LILCO asked the Commission to allocate about $15 million of the $75 million remedy to those customers.

On March 16, 1992, the Commission issued another order denying both rehearing requests. The Commission refused to reinstate the $26 million in transportation revenues because

> around the time of the Transco transactions at issue here the Commission itself had authorized other pipelines to engage in special marketing programs that had discriminatory effects similar to those of Transco's transactions in this case. However, in the *Maryland People's Counsel* cases the Court of Appeals found the Commission had not adequately justified the discrimination. Although the specific Transco transactions here do not have the veneer of Commission authorization, as those at issue in the *Maryland People's Counsel* cases, nonetheless, it does not appear to be equitable to penalize Transco further for discrimination similar to that which the Commission itself did not think was undue prior to the ruling of the Court of Appeals in the *Maryland People's Counsel* cases.

On appeal to this court, Transco asks us to reverse the Commission's remedy disallowing its recovery of $75 million. NCUC and LILCO urge us to revise the remedy. The Commission seeks enforcement of its final order in full.

## II.

Our jurisdiction to review the Commission's orders arises under section 19(b) of the NGA, 15 U.S.C. § 717r(b), which states that the Commission's factual findings shall be conclusive if

supported by substantial evidence. We review the Commission's orders to prevent an "arbitrary result." *Borden, Inc. v. FERC,* 855 F.2d 254, 258 (5th Cir.1988).

The seminal case discussing an appellate court's review of the Commission's orders under the NGA is *Permian Basin Area Rate Cases,* 390 U.S. 747, 790-92, 88 S.Ct. 1344, 1372-73, 20 L.Ed.2d 312 (1968), instructing reviewing courts to examine (1) whether the Commission abused or exceeded its authority; (2) whether each of the essential elements of the order is supported by substantial evidence; and (3) whether the Commission has given reasoned consideration to each of the pertinent factors in balancing the needs of the industry with the relevant public interests. *Id.* Our duty "is not to supplant the Commission's balance of these interests with one more nearly to [our] liking, but instead to assure [ourselves] that the Commission has given reasoned consideration to each of the pertinent factors." *Id.* at 792, 88 S.Ct. at 1373. The " "ultimate issue' " in our review is the " "requirement of "reasoned consideration." ' " *Borden,* 855 F.2d at 258-59 (quoting *Consolidated Gas Supply Corp. v. Federal Power Comm'n,* 520 F.2d 1176, 1185 n. 45 (D.C.Cir.1975)).

A review of the record and the Commission's order convinces us that the result the Commission reached is not arbitrary. The Commission gave careful and reasoned consideration to the controversy before it. Substantial evidence supports its conclusion that Transco violated the NGA, and the remedy the Commission imposed was well within its equitable powers.

### III.

### A.

Both the ALJ and the Commission determined that Transco had violated sections 7(c), 4(d), and 4(b) of the NGA by selling gas to customers without the requisite certification, by selling gas at a price below its filed rate, and by making unduly discriminatory sales.

The ALJ found, and the Commission agreed, that Transco, TRI, and TEMCO were a single entity. Substantial evidence supports this finding. The composition of the three companies' corporate boards was almost identical. All of TRI's officers also were Transco officers; six of TEMCO's seven directors were on Transco's board. Transco, TRI, and TEMCO had the same address. In addition, agreements among the three were wholly informal, and no legal documents governed transactions

among them. A Transco witness testified that TRI was "really operated as an adjunct" of Transco. Transco's attorney told the ALJ that Transco created TRI and TEMCO "to sell at the spot price" because, under the NGA, Transco could not.

In *General Tel. Co. v. United States,* 449 F.2d 846, 855 (5th Cir.1971), we declared, "Where the statutory purpose could thus be easily frustrated through the use of separate corporate entities, the Commission is entitled to look through corporate form and treat the separate entities as one and the same for purposes of regulation." (Citations omitted.) Under this test, the ALJ and the Commission correctly looked behind corporate forms and found that the three companies really were one. For the Commission not to have investigated further would frustrate a statutory purpose by allowing Transco to set up subsidiaries to sell gas at prices at which the company could not legally sell.

Transco argues that the transactions at issue were transportation imbalances, not sales as the ALJ and the Commission found. Once again, substantial evidence supports the Commission's finding. Title to the gas transferred from Transco to its customers. Once a customer received gas from Transco, it paid money to Transco. In addition, while Transco's transportation tariff required elimination of imbalances within thirty days, the "imbalance" here lasted thirteen months. Finally, Transco never informed its customers of the existence of imbalances, even though the customers would have been financially accountable for them.

Transco asserts the Commission has no precedent for reconstituting the transactions as it did. It claims that *Granite State Transmission, Inc.,* 47 FERC ¶ 61,429 (1989), supports its position that the transactions at issue were sales because in that case the agency found an imbalance when a pipeline intentionally had overpurchased gas to pursue a lower-cost strategy. *Granite State,* however, is distinguishable, as the imbalances there resulted from operational or accounting inefficiencies, not an intentional marketing strategy as was the case here. So, we do not agree with Transco's assertion that the Commission previously has approved of similar imbalances and now may not characterize Transco's imbalances as sales.

The ALJ and the Commission found that Transco's sales of gas to non-captive customers at

a lower rate than to captive customers constituted undue price discrimination. Transco admitted to the ALJ that discrimination existed: "[S]ure there is discrimination here. There is no question. Captive customers were charged a different price than non-captive customers." Once the Commission shows that discrimination exists, the pipeline has the burden of showing that the discrimination was not undue. *ANR Pipeline Co.,* 41 FERC ¶ 61,043, ¶ 61,126 (1987).

In *MPC I,* 761 F.2d 768, 770 (D.C.Cir.1985), the Commission sought approval of a plan that would allow pipelines to sell gas to non-captive customers at cheaper prices than to captive customers. While the pipelines argued that the plan would lead to reduced take-or-pay liability and overall cheaper gas, the captive customers countered that the plan would increase their gas costs. *Id.* at 772. The court refused to approve this plan, "since it would harm rather than help precisely those customers—the ones vulnerable to pipeline monopoly [captive customers]—over which it was the purpose of the Natural Gas Act to protect." *Id.* at 779. Additionally, in *Associated Gas Distribs. v. FERC,* 824 F.2d 981, 1010 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), the court pointed out that in the sale of gas, "there is no economic justification for charging different prices, based on the purchasers' differing access to substitutes...."

Transco's plan was quite similar to the plan rejected in *MPC I.* The alleged benefits—reduced take-or-pay liability and overall cheaper gas—were similar. The price discrimination against captive customers was the same. Transco knew the result of the previous cases decided by the District of Columbia Circuit, yet still it chose to pursue its plan.

Transco did not make any showing that discriminatory pricing was the only way to achieve the alleged benefits it sought, nor did it show why the cheaper gas could not be used to lower the price of gas to the captive customers. Through reasoned decisionmaking and supported by substantial evidence, the ALJ and the Commission properly concluded that Transco did not make the high showing that the discrimination was not undue.

The ALJ's and the Commission's considered determinations that Transco violated the NGA are supported by substantial evidence in the record. In short, because they logically concluded that Transco, TRI, and TEMCO were one entity, sales by a subsidiary were sales by Transco. Many of

these sales were made to customers to which Transco could not sell because it lacked proper certification, in violation of section 7(c). Transco, through TRI and TEMCO, sold gas at a rate below its filed rate of $3.01 per Dth, in violation of section 4(d). Finally, Transco sold gas to captive customers at a higher rate than to non-captive customers, engaging in undue discrimination in violation of section 4(b).

B.

In Phase II of his opinion, the ALJ refused to allow Transco to pass through $75 million to its customers and ordered Transco to disgorge $26 million in profits it had made transporting illegally sold gas. In its final order, the Commission upheld its refusal to pass through $75 million but rejected the $26 million disgorgement.

Transco argues that the Commission properly eliminated the $26 million part of the remedy but incorrectly continued to refuse the passthrough. Transco first attacks the continued imposition of this remedy as contrary to *Coastal Oil & Gas Corp. v. FERC,* 782 F.2d 1249 (5th Cir.1986). It argues that the remedy the Commission imposed here actually is a civil penalty, forbidden by *Coastal.* In *Coastal,* 782 F.2d at 1253, we said that the NGA "does not give the Commission the authority to impose civil penalties." (Citations omitted.) The Commission's remedy there required a seller of natural gas first to refund all profits from its illegal sale of gas and then to refund "any payment whatsoever" for the gas, including its costs. *Id.* While we rejected a remedy that called for a refund of any payment made, we did point out that a remedy that restored the status quo ante and prevented unjust enrichment was appropriate. *Id.*

Transco's argument that the remedy here violates our decision in *Coastal* is unavailing. In *Coastal,* we held that a remedy that forces a company to give up all payment for gas is a penalty. The remedy the Commission approved here does not force Transco to give up all payment for gas it sold. Rather, it allowed Transco to recover its actual cost of gas, specifically taking into account the lower prices TRI and TEMCO paid for gas, but it refused to allow Transco to recover money it lost when it illegally sold gas at prices below its filed rate through TRI and TEMCO. This is a far cry from the "civil penalty" we rejected in *Coastal.*

The final Commission order approving the $75 million remedy found an appropriate relationship between the remedy and the violation, namely that the denial of Transco's $75 million passthrough was closely related to Transco's illegal sale of gas. Customers who were harmed by paying Transco's filed rate of $3.01 per Dth for gas that actually cost less will not be harmed further by having to pay an extra $75 million to Transco.

Transco retorts that the remedy is flawed because its customers did not overpay for gas, since an examination of Transco's overall receipts between April 1985 and April 1986 shows that Transco received from all its customers about $80 million less than it paid for gas. It also asserts that its customers benefitted from purchasing cheap gas from TRI and TEMCO at the outset of the transactions, to the point that it counterbalanced any "harm" involved in pricing gas TRI and TEMCO returned to Transco at the higher WACOG rate it later sold to customers and now tries to pass through. Implicitly, Transco argues that it was trying to arrange creative legal solutions to a dilemma brought on by an industry in a state of turmoil and uncertainty.

By contrast, the Commission and the ALJ found that Transco devised a strategy that allowed it to bill its captive customers for losses it incurred when TRI and TEMCO sold gas below its filed rate. They found, and the record confirms, that Transco incurred losses when TRI and TEMCO sold gas to non-captive customers at the market rate, presumably because their actual cost of gas was greater than this rate. When TRI and TEMCO repaid to Transco gas that Transco had "loaned" to them, Transco accounted for this at a rate of $3.01 per Dth, instead of the actual lower cost of about $2.40 per Dth at which TRI and TEMCO received this gas. Transco thus inflated the cost of the "return" gas in order to recover some of the cost of the gas it had sold illegally.

The Commission's reasoning then—that the illegal sales and the resulting purchases were linked so that refusing to allow Transco the $75 million passthrough was a correct remedy—is based upon substantial evidence in the record, evidence that shows that Transco tried to inflate its WACOG by recording the price of gas at a higher rate than it actually paid. The Commission's decision to limit Transco's passthrough to the actual cost of the replacement gas thus was a reasoned one: The Commission refused to penalize Transco's customers for losses Transco suffered as a result of its

damaging pre-existing contracts or its plan to escape them.

Transco's argument that the Commission should allow the passthrough because Transco implemented its plan as a way of coping with chaotic industry situations is no more persuasive. Although the Commission initially approved Transco's first Special Marketing Program, it gave only contingent approval to Transco's revised Discount Service Program. Final approval hinged on a decision by the District of Columbia Circuit. Not content to wait for the requisite approval, Transco implemented a variation of its Discount Service Program, selling gas through TRI and TEMCO in April 1985.

In May 1985, the District of Columbia Circuit issued its first opinions in the *MPC* cases. Even though these decisions rejected programs very similar to the one Transco devised, Transco continued to sell gas through TRI and TEMCO. Despite this notice, Transco plowed ahead in its own effort to address problems affecting it. In the face of its insistence to continue, without authorization, a program disallowed by the court of appeals, Transco cannot now be heard to say that an industry's state of flux excuses its illegal behavior.

## IV.

Two further criticisms of the Commission's remedy remain. LILCO argues that the decision to order Transco to refund the $48.5 million it already has collected is not a reasoned decision. It asserts that the refunds will be made *pro rata* to some customers who paid less than the captive customers. Therefore, the captive customers continue to be denied benefits from the discounted sales. LILCO maintains, for example, that because it paid an average price of $2.94 per Dth for its gas, while the average price for all Transco gas was $2.87 per Dth, it paid $2,893,436 more than it should have. A *pro rata* remedy, LILCO insists, does not redress its actual harm.

Although LILCO's argument has some superficial appeal, it does not defeat the Commission's response. Transco already has collected about $48.5 million from specific customers. In its order, the Commission states that "fairness and equity require that the surcharge amounts already collected shall be refunded to the Transco customers who paid such amounts." The customers who paid the surcharge should recover what they paid. This is logical as well as legal, as "the Commission has

broad authority to fashion equitable remedies in a variety of settings." *Columbia Gas Transmission Corp. v. FERC,* 750 F.2d 105, 109 (D.C.Cir.1984).

The ALJ initially included a second remedy, ordering Transco to disgorge about $26 million in net transportation revenues it had collected for carrying gas that it then sold illegally. About $15.7 million would go to those customers who had paid discriminatory prices and $10.3 million would go to customers who paid the filed rate. Although the Commission approved of this remedy in its first order, finding that it simply required Transco to disgorge profits on transportation of illegally sold gas, it eliminated this remedy in its January 15, 1992, and March 16, 1992, orders, reasoning that market circumstances in 1985 were confusing and that the Commission originally thought schemes like Transco's were acceptable.

NCUC contends that this is not reasoned decisionmaking. It maintains that this was the only remedy specifically geared to provide restitution for victims of price discrimination, and the Commission arbitrarily eliminated it without articulating any proper justification; its elimination fails to leave any remedy for those directly affected by Transco's illegal actions. NCUC also attacks FERC's "market circumstances" reasoning, pointing out that Transco started its program without the Commission's approval, in contrast to other pipelines that started their programs earlier than Transco, yet still sought the Commission's approval.

The Commission has broad discretion to fashion a remedy. *Columbia Gas Transmission Corp.,* 750 F.2d at 109. *See also Mesa Petroleum Co. v. Federal Power Comm'n,* 441 F.2d 182, 186 (5th Cir.1971) (The Commission's predecessor, the Federal Power Commission, had authority to structure remedy.). In this case, it rationally and reasonably decided that the $75 million remedy sufficiently addressed any harm. It was allowed to take the market conditions into account in determining that "limiting the remedy to the recalculation of the allowable unrecovered gas costs" was in best keeping with the chaotic circumstances of the time.[11]

---

[11]NCUC argues that where the facts demonstrate injury to the customer, FERC is obliged to impose a remedy. Unfortunately, the cases it cites do not support such a conclusion. In *Atlantic Refining Co. v. Public Serv. Comm'n,* 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), the Court was not concerned with providing a remedy for harm to customers. It instead focused on the jurisdiction and discretion of the Federal Power Commission under § 7(e) of the NGA. *Id.* at

Finally, NCUC asserts that illicit *ex parte* contacts between Transco's attorneys and the Commission's attorneys led to the Commission's hearing oral argument on a petition for rehearing. NCUC implies that secret information passed hands, leading to the Commission's unusual grant of oral argument. NCUC continues that some undisclosed "critical secret documents" show that attorneys for Transco and the Commission discussed something more than just a request for oral argument.

Transco and the Commission reject this argument. Transco asserts that its attorney simply reiterated his prior written request for oral argument. The Commission points out that the request led only to a procedural result—an opportunity for all sides to present their arguments orally. NCUC gives no evidence whatsoever to bolster its position that something else transpired. In its opinion resolving the *ex parte* issue, the Commission concluded that even if it treated the communication as *ex parte,* no harm resulted, and no damage was done to the decisionmaking process.

Although the request for oral argument should have been in writing, with notice to all parties, we agree with the Commission's determination that NCUC provides no evidence that any improper activity took place. Nor was NCUC prejudiced in any way. NCUC was allowed to file briefs and argue its case. The Commission correctly chose to hear oral argument.

V.

In conclusion, we find that substantial evidence supports the reasoned Commission's order.

---

380, 79 S.Ct. at 1249. Similarly, in *Public Serv. Comm'n v. FERC,* 543 F.2d 757, 811 (D.C.Cir.1974), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976), the court held that when refunds are due, they must be made promptly. The court did not find an affirmative duty to order refunds. Finally, *Gulf Oil Corp. v. FERC,* 706 F.2d 444 (3d Cir.1983), *cert. denied,* 464 U.S. 1038, 104 S.Ct. 698, 79 L.Ed.2d 164 (1984), does not apply to our case. *Gulf Oil* concentrates on the support in the record for FERC's calculation of a refund, not the mandatory nature of refunds. *Id.* at 447.

In *Towns of Concord, Norwood, & Wellesley v. FERC,* 955 F.2d 67, 72 (D.C.Cir.1992), the court addressed the question of whether sections of the Federal Power Act (parallel to the NGA sections applicable here) confer on FERC the discretion to refuse to order refunds when a company has violated the filed rate doctrine and passed on costs to its customers. The court decided that FERC was not obligated to impose a refund. *Id.* at 76. It "refused to constrain agency discretion by imposing a presumption in favor of refunds.... The agency need only show that it "considered relevant factors and ... struck a reasonable accommodation among them.' " *Id.* (quoting *Los Cruces TV Cable v. Federal Communications Comm'n,* 645 F.2d 1041, 1047 (D.C.Cir.1981)).

Transco violated sections 4(b), 4(d), and 7(c) of the NGA.  As a remedy, the Commission approved part of an ALJ's opinion refusing to allow Transco to pass through $75 million to its customers.  The Commission also eliminated an additional remedy that ordered Transco to disgorge an additional $26 million.  This was all within FERC's discretion, supported by substantial evidence, and based upon reasoned decisionmaking.  We therefore DENY the petitions for review and AFFIRM the Commission's order in full.