TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00731-CV






CenterPoint Energy Entex, Appellant 


v.


Railroad Commission of Texas, Victor Carrillo, Elizabeth A. Jones,

Michael Williams, City of Tyler and State of Texas, Appellees (1)







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. GN402169, HONORABLE DARLENE BYRNE, JUDGE PRESIDING




O P I N I O N




 This appeal presents a question of first impression: whether the Texas Railroad
Commission (the Commission) may conduct a retroactive prudence review of charges flowed
through a purchased gas adjustment clause (PGA clause) and order refunds of charges that the
Commission finds the utility imprudently incurred. We must also consider whether such a review
is a "ratemaking proceeding" in which a participating municipality is entitled to expense
reimbursement. See Tex. Util. Code Ann. § 103.022 (West 1998). The Commission and the district
court answered both questions in the affirmative. Because we find that the Commission has
authority to conduct the review and order refunds but that such a review is not a "ratemaking
proceeding," we affirm the order of the district court in part but reverse and render in part. 


BACKGROUND

 Appellant CenterPoint Energy Entex (2) is a gas utility subject to the Gas Utility
Regulatory Act. See Tex. Util. Code Ann. § 101.003(7) (West Supp. 2005); see generally id.
§§ 101.001-105.051 (West 1998 & Supp. 2005) (GURA). For more than twenty-five years, Entex
purchased gas on behalf of customers served by the Tyler Integrated Distribution System (TIDS) and
charged customers under tariffs approved by the City of Tyler (the City), termed "rate schedules." (3) 
Since 1985, each of Entex's approved rate schedules included a "Purchased Gas Adjustment
Provision" (PGA clause), an automatic escalator mechanism devised by utility regulators to deal with
rapid fluctuations in the cost of natural gas. See Railroad Comm'n of Tex. v. High Plains Natural
Gas Co., 613 S.W.2d 46, 48 (Tex. Civ. App.--Austin 1981), writ ref'd n.r.e., 628 S.W.2d 753 (Tex.
1981) (per curiam). Such a clause operates to increase or decrease the revenue of the gas company
by exactly the amount of its increased or decreased costs of gas charged the gas company by its
suppliers. Id. (citing City of Norfolk v. Virginia Elec. & Power Co., 90 S.E.2d 140 (Va. 1955)). 
Although Texas has never expressly addressed the use of PGA clauses in a statute, our courts have
long approved of their use by regulators. See San Antonio Indep. Sch. Dist. v. City of San Antonio,
550 S.W.2d 262, 266-67 & n.2 (Tex. 1976); High Plains Natural Gas Co., 613 S.W.2d at 48 (citing
City of Chicago v. Illinois Commerce Comm'n, 150 N.E.2d 776 (Ill. 1958)); Railroad Comm'n of
Tex. v. City of Fort Worth, 576 S.W.2d 899, 902 (Tex. Civ. App.--Austin 1979, writ ref'd n.r.e.);
see also Tex. Util. Code Ann. §§ 101.001-105.051 (no express recognition of PGAs). (4) 

 Since at least November 1992, Entex notified the City on a monthly basis regarding
any gas cost changes that it would flow to its customers through the PGA clause. In some months,
Entex reported no changes. In others, it informed the City of a change, either an increase or a
decrease, and generally provided supporting information in the form of two Entex-generated
documents stating the cost of gas purchased from several gas distributors and the effect those costs
would have on the amounts charged to customers. 

 In 2002, the City began reviewing Entex's past customer gas charges, after which it
informed Entex of "concerns" it had about the manner by which Entex purchased gas for resale to
its customers. In particular, Entex had been acquiring its gas through two gas contracts, one with
Texas GasMark, Inc. (TGM contract) and one with TXO Gas Marketing Corporation (TXO
contract). Both of the gas supplies purchased under each contract were "firm" (as opposed to
interruptible), but the TGM contract price was significantly lower than the TXO contract price. It
was alleged that Entex acted wrongfully by charging the higher priced gas to residential and small
commercial customers while reserving the lower-priced gas for large commercial customers. The
City believed that this procedure resulted in "overcharges" of about $39,000,000 to residential and
small commercial customers because Entex had passed the higher-priced gas charges to those
customers through the PGA clauses in Entex's filed rates. The City made further charges alleging
that Entex had filed misleading tariffs, failed to request annual price redeterminations, and failed to
charge non-Tyler customers for their proportionate share of Entex's capital costs. The City set the
matter for consideration at a city council meeting. 

 Entex filed suit in Travis County district court seeking a declaration that the City
lacked authority to order refunds and an injunction to prevent consideration of the issue at the city
council meeting. Entex asserted that ordering refunds for gas distribution was within the exclusive
jurisdiction of the Commission. See Tex. Util. Code Ann. § 104.005(c) (West 1998). Entex and the
City agreed that Entex would dismiss its district court proceedings and that the parties would instead
submit the issues directly to the Commission. In their "Joint Petition for Review of Charges for Gas
Sales," (5) the parties requested that 


the Commission initiate a proceeding to determine whether Entex has properly and
lawfully charged and collected for gas sales to residential and commercial customers
served from the TIDS during the period from November 1, 1992 to October 31, 2002,
to consider any appropriate remedies, including but not limited to, refunds, with
interest, and to enter such orders as may be appropriate.



 But the parties disputed what the Commission's review should entail. Entex urged
that the Commission had power only to determine whether Entex "properly and lawfully charged and
collected for gas sales to residential and commercial customers in Tyler as authorized under its tariffs
and rate schedules" but that the Commission could not consider the prudence of Entex's gas
purchases because that would constitute retroactive ratemaking. See id. § 104.151. Entex also
maintained that the Commission should first consider the scope of its review authority before
reaching the merits of the City's allegations. The City argued that the Commission could conduct
a retroactive prudence review of Entex's gas purchases (6) and that the Commission should address in
a single proceeding both the scope of its authority to review Entex's charges and to order refunds
and the merits of the City's allegations. The City also requested that the Commission order Entex
to reimburse the City for its expenses because it considered the proceeding to be a "rate case" as
defined in the utilities code. See id. § 103.022 (West 1998). Entex responded that the case was not
a "ratemaking proceeding" and, thus, the City was not entitled to recover its expenses. See id.
§ 103.022. 

 The Commission set the matter before two hearing examiners, who decided that
"issues related to a consideration of the reasonableness and necessity of Entex's gas costs and gas
purchase practices will be considered in this proceeding." The Commission denied Entex's appeal
of this decision. After a hearing on the merits, the hearing examiners rejected the City's argument
that any proceeding that affects the compensation of a utility is a ratemaking proceeding. Instead,
they decided that "ratemaking proceedings" are only those that are exclusively devoted to rates such
that they may result in changed rates. Thus, the examiners found that the City could not be entitled
to reimbursement for its expenses. On appeal, the Commission reversed that holding and awarded
the City 90 percent of its expenses. (7)

 Entex then filed suit in Travis County district court seeking a declaration that the
Commission lacks authority to conduct a retroactive prudence review of gas purchases and,
alternatively, that such an action by the Commission is not a "ratemaking proceeding" in which the
City could obtain expense reimbursement. It also asked the district court to enjoin enforcement of
the Commission's order requiring Entex to reimburse the City 90 percent of its expenses. The
district court rendered judgment declaring that the Commission has authority to conduct a retroactive
prudence review of gas purchases and that such a proceeding is a ratemaking proceeding in which
the City could recover expenses. This appeal followed. (8)


DISCUSSION

 Entex brings two issues on appeal that mirror its issues before the district
court--whether the Commission has authority to conduct a retroactive prudence review of gas
purchases that Entex flowed through the PGA clauses and whether such a proceeding is a ratemaking
proceeding for which the City can seek expense reimbursement.


Standard of review

 Our consideration of Entex's appellate issues ultimately turns upon statutory
construction. Statutory construction is a matter of law, which we review de novo. City of San
Antonio v. City of Boerne, 111 S.W.3d 22, 25 (Tex. 2003). The goal of statutory construction is to
give effect to the intent of the legislature. Fleming Foods of Tex., Inc. v. Rylander, 6 S.W.3d 278,
284 (Tex. 1999); Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 280 (Tex. 1994). We
consider, among other factors, the language of the statute, legislative history, the nature and object
the legislature intended to be obtained, and the consequences that would follow from alternative
constructions, even when a statute is not ambiguous on its face. Tex. Gov't Code Ann. § 311.023
(West 1998); Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001); United Servs. Auto.
Ass'n v. Strayhorn, 124 S.W.3d 722, 728 (Tex. App.--Austin 2003, pet. denied). We consider
disputed provisions in context, not in isolation. Texas Workers' Comp. Comm'n v. Continental Cas.
Co., 83 S.W.3d 901, 905 (Tex. App.--Austin 2002, no pet.); see Fitzgerald v. Advanced Spine
Fixation Sys., 996 S.W.2d 864, 866 (Tex. 1999). 

 The legislature has instructed us that GURA is to "be construed liberally to promote
the effectiveness and efficiency of regulation of gas utilities." Tex. Util. Code Ann. § 101.007 (West
1998). However, as an administrative agency, the Commission may exercise only those powers that
the legislature confers upon it in clear and express language and cannot create and exercise what
really amounts to a new or additional power for the purpose of administrative expediency. Texas
Natural Res. Conservation Comm'n v. Lakeshore Util. Co., 164 S.W.3d 368, 377 (Tex. 2005);
Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio, 53 S.W.3d 310, 316 (Tex. 2001). This
is because as an administrative agency the Commission is a creature of the legislature with no
inherent authority of its own. Lakeshore Util. Co., 164 S.W.3d at 377. "When the Legislature
expressly confers a power on an agency, it also impliedly intends that the agency have whatever
powers are reasonably necessary to fulfill its express functions or duties." Id. at 378. And, an
agency created to centralize expertise in a certain regulatory area is ordinarily "given a large degree
of latitude in the methods it uses to accomplish its regulatory function." Texas Mun. Power Agency
v. Public Util. Comm'n, 150 S.W.3d 579, 586 (Tex. App.--Austin 2004, pet. granted). However,
an agency may not, in the guise of implied powers, exercise what is effectively a new power, or a
power contrary to a statute, on the theory that such exercise is expedient for the agency's purpose,
City of Austin v. Southwestern Bell Tel. Co., 92 S.W.3d 434, 441 (Tex. 2002), nor may it contravene
specific statutory language, run counter to the general objectives of the statute, or impose additional
burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. 
State v. Public Util. Comm'n of Tex., 131 S.W.3d 314, 321 (Tex. App.--Austin 2004, pet. denied).


Retroactive prudence review of gas purchases

 In its first issue, Entex argues that the Commission lacks authority to conduct
retroactive prudence reviews of gas purchase charges flowed through a PGA clause or to order
refunds. It also asserts that such a review that might result in a refund order violates the filed rate
doctrine and is a form of prohibited retroactive ratemaking.

 

 Regulatory and policy context

 We begin by recognizing that the legislature to date has continued to impose a
comprehensive regime of traditional rate regulation on gas utilities. Gas utilities are monopolies in
the areas they serve. Tex. Util. Code Ann. § 101.002(b) (West 1998). As a result, "the normal
forces of competition that regulate prices in a free enterprise society do not operate." Id. Instead,
the legislature sought through GURA "to establish a comprehensive and adequate regulatory system
for gas utilities to assure rates, operations, and services that are just and reasonable to the consumers
and to the utilities," with the overarching goal of protecting "the public interest inherent in the rates
and services of gas utilities." Id. § 101.002(a). To this end, the legislature charged the Commission
with the task of ensuring "compliance with the obligations of gas utilities" in GURA and granted the
Commission broad powers to regulate "utility rates, operations, and services as a substitute for
competition." Id. § 104.001 (emphasis added). The legislature emphasized that the Commission
"shall ensure that each rate a gas utility or two or more gas utilities jointly make, demand, or receive
is just and reasonable" in a manner that will "permit the utility a reasonable opportunity to earn a
reasonable return on the utility's invested capital used and useful in providing service to the public
in excess of its reasonable and necessary operating expenses." Id. § 104.003. These policy goals
inform our analysis of the Commission's powers here. See id. § 101.007; compare with TXU
Generation Co., L.P. v. Public Util. Comm'n of Tex., 165 S.W.3d 821, 851-52 (Tex. App.--Austin
2005, pet. filed) (Pemberton, J., dissenting) (arguing that PURA's competition statutory objectives
should inform our view of the Commission's general powers to ensure both "safe, reliable, and
reasonably priced electricity" in retail market and that ancillary services are available at "reasonable
prices").


 PGA clauses


 We next note the nature and function of PGA clauses. (9) Fuel adjustment clauses for
utilities, such as the PGA clauses at issue in this case, originated as part of utility rate schedules in
response to the rapid changes in coal prices during World War I. Richard J. Pierce, Reconsidering
the Roles of Regulation and Competition in the Natural Gas Industry, 97 Harv. L. Rev. 345, 373
(1983). They allow a utility to adjust charges automatically, either up or down, on an ongoing basis
in response to fluctuating fuel costs. Dennis Schiffel, Electric Utility Regulation: An Overview of
Fuel Adjustment Clauses, 95:13 Pub. Util. Fort. 23, 23-24 (1975); R.S. Trigg, Escalator Clauses in
Public Utility Rate Schedules, 106 U. Pa. L. Rev. 964, 964 (1958). In other words, an automatic fuel
adjustment clause is "a fixed rule under which future rates to be charged the public are determined. 
It is simply an addition of a mathematical formula to the filed schedules of the Company under
which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates." City
of Norfolk, 90 S.E.2d at 148; see also Louisiana Pub. Serv. Comm'n v. Federal Energy Regulatory
Comm'n, 688 F.2d 357, 360-61 (5th Cir. 1982). 

 Other cost components of rate schedules are generated from historically based
projections of future costs and so are reflected in fixed components of the rate schedule. (10) See
Pierce, 97 Harv. L. Rev. at 373. Although sometimes criticized, this bifurcated regulatory treatment
is generally deemed satisfactory because most costs tend to increase gradually and predictably while
fuel costs are particularly subject to dramatic and unforeseeable changes. (11) Id. at 373 n.152. In
addition, fuel costs constitute such a large proportion of a utility's total costs that any substantial
regulatory lag (12) in approving rate increases to reflect fuel cost increases can cause the rapid financial
ruin of an otherwise healthy utility. (13) Id. PGA clauses permit fluctuations in the utility's costs to
be passed through directly to its customers as cost adjustments in subsequent utility bills. Elizabeth
Warren, Regulated Industries' Automatic Cost of Service Adjustment Clauses: Do They Increase or
Decrease Cost to the Consumer?, 55 Notre Dame L. Rev. 333, 336 (1980). Through a PGA clause,
then, a utility can track its customer charges more closely to its current cost of fuel without
continually having to file for rate increases (or decreases) and ameliorate the regulatory lag problem.
See Public Serv. Co. of N. H. v. Federal Energy Regulatory Comm'n, 600 F.2d 944, 947 (D.C. Cir.
1979); Gulf Power Co. v. Florida Public Serv. Comm'n, 487 So. 2d 1036, 1037 (Fla. 1986).

 Generally, implementation of PGA clauses is an exercise by a regulatory commission
of its ratemaking, as opposed to rulemaking, power, and PGA clauses are generally adopted in a
ratemaking proceeding as an integral part of a utility's overall rate structure. See Public Serv. Co.
of N. H., 600 F.2d at 947 (describing such clauses as part of "utility's filed rate"); Scates v. Arizona
Corp. Comm'n, 578 P.2d 612, 616 (Ariz. 1978); In re Petition of Allied Power & Light Co., 321
A.2d 7, 10-11 (Vt. 1974); Trigg, 106 U. Pa. L. Rev. at 996. In some jurisdictions, regulatory
commissions are statutorily authorized to implement such clauses; in others, the regulatory
commission implements such clauses pursuant to its plenary ratemaking authority. See Daily
Advertiser v. Trans-La, Div. of Atmos Energy Corp., 612 So. 2d 7, 23 (La. 1993). As already noted,
such clauses have been judicially recognized and approved in Texas, and we have also described the
adoption of a PGA as being part of a ratemaking proceeding. San Antonio Indep. Sch. Dist., 550
S.W.2d at 266-67 & n.2; High Plains Natural Gas Co., 613 S.W.2d at 48; City of Fort Worth, 576
S.W.2d at 902. 


 Entex's approved rate and its PGA clause

 We next consider the relationship between the PGA clause here and Entex's approved
rate. GURA defines a "rate" as 


(A) any compensation, tariff, charge, fare, toll, rental, or classification that is directly
or indirectly demanded, observed, charged, or collected by a gas utility for a
service, product, or commodity described in the definition of gas utility in this
section; and


(B) a rule, regulation, practice, or contract affecting the compensation, tariff, charge,
fare, toll, rental, or classification.



Tex. Util. Code Ann. § 101.003(12) (West Supp. 2005). Through this language, the legislature has
recognized that a rate may consist not merely of a fixed dollar amount but may instead be a rule
"affecting" the charge, a term contemplating the use of variables. See id. § 101.003(12)(B). 

 The approved rate schedules in this case amount to a rule providing a three-step
process for computing a customer's monthly gas charge. (14) See id.; see also Appendix A. First, the
rate schedule sets each customer a minimum monthly bill, $9.19. Second, the rate schedule defines
the price of gas per 100 cubic feet of gas. (15) Collectively, these prices may be termed the "rate base"
because they set the base from which the actual customer charge will vary according to the terms of
the third part of the rate schedule, the PGA clause. The third component, the PGA clause, states that
the "net monthly rate per unit sold is predicated upon a price of natural gas purchased for resale" at
$4.5705 per Mcf. (16) As a result, the actual customer charge for gas would be the amount set by the
base rate, adjusted for the deviation of the cost of gas to Entex from the assumed purchase price of
$4.5705 per Mcf. 

 This "rule" fits squarely within the statutory definition of "rate." See Tex. Util. Code
Ann. § 101.003(12)(B). We thus conclude that an Entex gas rate consists of its entire rate schedule,
which may result in differing customer charges month-to-month. See 16 Tex. Admin. Code
§ 7.315(a), (c)(8) (2005) (formula may constitute rate; rate adjustment provision must be part of rate
filing); cf. ChevronTexaco Exploration & Prod. Co. v. Federal Energy Regulatory Comm'n, 387
F.3d 892, 895 (D.C. Cir. 2004) (quoting Transwestern Pipeline Co. v. Federal Energy Regulatory
Comm'n, 897 F.2d 570, 578 (D.C. Cir. 1990)) (under Federal Natural Gas Act, FERC may approve
"a tariff containing a rate 'formula' or a rate 'rule'" instead of a specific number); Pierce, 97 Harv.
L. Rev. at 349 n.29 (rates generally may consist of fixed values and variable components). 


 The Commission's authority over the rate

 The regulatory authority, whether the Commission or a municipality, "shall ensure
that each rate a gas utility or two or more gas utilities jointly make, demand, or receive is just and
reasonable." Tex. Util. Code Ann. § 104.003 (West 1998). Rates must be established so as to
permit the utility "a reasonable opportunity to earn a reasonable return on the utility's invested
capital used and useful in providing service to the public in excess of its reasonable and necessary
operating expenses." Id. §§ 104.051, .053. "A gas utility may not directly or indirectly charge,
demand, collect, or receive from a person a greater or lesser compensation for a service provided or
to be provided by the utility than the compensation prescribed by the applicable schedule of rates
filed." Id. § 104.005. Finally, the Commission "may require the examination and audit of the
accounts of a gas or municipally owned utility" and may inspect "the papers, books, accounts,
documents, and other business records of a gas utility within its jurisdiction." Id. §§ 102.202, .203. 

 The utilities code does not define "examination" or "audit," so we may rely on
definitions listed in commonly used dictionaries to discern the plain meaning of terms in the statute.
See Powell v. Stover, 165 S.W.3d 322, 326 (Tex. 2005); Texas Dep't of Protective & Regulatory
Servs. v. Mega Child Care, Inc., 145 S.W.3d 170, 196 (Tex. 2004); Sheshunoff v. Sheshunoff, 172
S.W.3d 686, 695 n.8 (Tex. App.--Austin 2005, pet. filed). An "examination" is "an inspection" or
"analysis." American Heritage Dictionary 456 (1973). An audit is a "formal examination of an
individual's or organization's accounting records, financial situation, or compliance with some other
set of standards." Black's Law Dictionary 126 (7th ed. 1999). It may involve "an adjustment or
correction of accounts." American Heritage Dictionary 86.

 The legislature has charged the Commission to ensure "compliance with the
obligations of gas utilities" in GURA and to regulate "utility rates, operations, and services as a
substitute for competition," Tex. Util. Code Ann. § 104.001, and has specifically enumerated its
power to conduct examinations and audit the utilities. Id. §§ 102.202, .203. The PGA clause, as part
of the rate, is an important and varying factor in the charge to the utilities customers, and the amount
charged to customers ultimately depends, under the terms of the PGA clause, on the price of gas
purchased. PGA clauses are merely recoupment devices designed to permit utilities a
dollar-for-dollar recovery of fluctuations in fuel costs. The customer is harmed by the
implementation of such clauses only if such clauses are manipulated or abused, thus encouraging the
promulgation of rate charges that are neither just nor reasonable to the ratepayer. See Fowler, 6 St.
Mary's L.J. at 578-81; see also In re Niagara Mohawk Power Corp., 507 N.E.2d 287, 291 (N.Y.
1987). These criticisms are met, however, when the regulatory body reviews charges recouped by
a utility through a PGA clause and determines that such charges were "just and reasonable." A
necessary corollary to such review is the power to take corrective action when the utility has
misapplied the terms of its rates. In other words, an allegation that a utility has manipulated its
purchases to artificially raise the cost of fuel differs in no substantial way from the claim that a utility
charged customers a price greater than an approved fixed rate. As the Ohio Supreme Court
observed, "the requirement of fairness which compels adjustment in rates to compensate utilities for
escalating fuel costs also compels retrospective reconciliation to exclude charges identifiably
resulting from unreasonable computations or inclusions." Ohio Power Co. v. Public Utils. Comm'n,
376 N.E.2d 1337, 1338-39 (Ohio 1978). 

 In response, Entex points out that although GURA and PURA share a common
legislative history, the legislature gave the Commission express authority in PURA to review and
reconcile the prudence of the fuel costs of electric utilities, see Tex. Util. Code Ann. § 36.203 (West
1998), yet included no such provision in GURA regarding gas utilities. Entex would have us infer
that the legislature did not intend to empower the Commission to review and reconcile gas utilities'
fuel costs. However, the legislature enacted the provision granting the Commission authority to
review and reconcile the prudence of fuel costs at a time when it had prohibited the PUC from
allowing electric utilities to use automatic fuel cost adjustment clauses like PGAs. Id. § 36.201
(West 1998); see also Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex., 173 S.W.3d 199, 206
(Tex. App.--Austin 2005, pet. filed). By contrast, Texas courts by that time had approved the use
of PGA clauses by gas utilities. See High Plains Natural Gas Co., 613 S.W.2d at 48. Against this
legal backdrop, the legislature understandably provided a method for timely review and adjustment
of an electric utility's fuel costs as an alternative for fuel factor adjustment clauses while including
no such provision regarding gas utilities. See Tex. Util. Code Ann. § 36.203(d). Thus, we find
uninstructive Entex's comparison with the express powers given to the PUC.

 As we have discussed, when a PGA clause is approved, the power to review past
purchases and order refunds is necessary to ensure compliance with the approved rate. We find it
reasonably necessary for the Commission to have the power to review past gas purchases and order
refunds as part of its express audit power to ensure compliance with the approved rate and its implied
power to approve PGA clauses. See id. §§ 104.005(a), (c) (Commission may order refund with
interest if it finds that utility violated terms of its filed rate); see also City Pub. Serv. Bd., 53 S.W.3d
at 316 (Tex. 2001); Lakeshore Util. Co., 164 S.W.3d at 378. Otherwise, the Commission's authority
would be reduced to the ministerial task of verifying the utility's arithmetic, and having the general
powers to regulate rates and ensure compliance together with the jurisdiction to examine and audit
the utilities would "be hollow and meaningless." See Texas Bldg. Owners & Managers Ass'n v.
Public Util. Comm'n of Tex., 110 S.W.3d 524, 532 (Tex. App.--Austin 2003, pet. denied); Public
Util. Comm'n of Tex. v. City of Austin, 728 S.W.2d 907, 915 (Tex. App.--Austin 1987, writ ref'd
n.r.e.); see also In re Redi-Flo Corp., 384 A.2d 1086, 1097 (N.J. 1978) (court could not be satisfied
that PGA clause itself was "just and reasonable" if clause operated free from regulatory board's
supervision and without periodic systematic review more comprehensive than "monitoring"). 


 Filed rate doctrine

 Entex next argues that the power to conduct a retroactive prudence review violates
the filed rate doctrine. We disagree.

 The "filed rate doctrine" applies when state law creates a state agency and a statutory
scheme under which the agency determines reasonable rates for the service provided. Arkansas La.
Gas Co. v. Hall, 453 U.S. 571, 579 (1981); Keogh v. Chicago & Northwestern Ry., 260 U.S. 156,
163 (1922); see also Tex. Util. Code Ann. § 104.005(a) (codifying filed rate doctrine). The doctrine
holds that a tariff filed with and approved by an administrative agency under a statutory scheme is
presumed reasonable unless a litigant proves otherwise. Southwestern Elec. Power Co. v. Grant, 73
S.W.3d 211, 216 (Tex. 2002). It concomitantly prohibits regulated utilities from "charging rates for
their services other than those properly filed with the appropriate regulatory authority." Entex v.
Railroad Comm'n of Tex., 18 S.W.3d 858, 862-63 (Tex. App.--Austin 2000, pet. denied) (quoting
Southwestern Bell Tel. Co. v. Metro-Link Telecom, Inc., 919 S.W.2d 687, 692 (Tex. App.--Houston
[14th Dist.] 1996, writ denied)). A tariff filed with and approved by an administrative agency under
a statutory scheme is presumed reasonable unless a litigant proves otherwise. Grant, 73 S.W.3d at
216; see Western Union Tel. Co. v. Esteve Bros. & Co., 256 U.S. 566, 572 (1921); Wegoland, Ltd.
v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994); Metro-Link Telecom, 919 S.W.2d at 691. Thus,
under the doctrine filed tariffs govern a utility's relationship with its customers and have the force
and effect of law until suspended or set aside. Grant, 73 S.W.3d at 217; see Keogh, 260 U.S. at
162-63; Carter v. AT&T Co., 365 F.2d 486, 496 (5th Cir. 1966); Metro-Link Telecom, 919 S.W.2d
at 692. Additionally, regulated utilities cannot vary a tariff's terms with individual customers,
discriminate in providing services, or charge rates other than those properly filed with the appropriate
regulatory authority. Maislin Indus. v. Primary Steel, Inc., 497 U.S. 116, 126 (1990); Arkansas La.
Gas, 453 U.S. at 577; Metro-Link Telecom, 919 S.W.2d at 692. A utility's obligations to its
customers cannot exceed its duties under the filed tariff. See Texaco, Inc. v. Central Power & Light
Co., 955 S.W.2d 373, 377 (Tex. App.--San Antonio 1997, pet. denied); Central Power & Light Co.
v. Romero, 948 S.W.2d 764, 767 (Tex. App.--San Antonio 1996, writ denied); see also Arkansas
La. Gas, 453 U.S. at 577-78. 

 The considerations underlying the doctrine are the preservation of the regulatory
agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated
companies charge only those rates of which the regulatory agency has been made cognizant. See
Concord v. Federal Energy Regulatory Comm'n, 955 F.2d 67, 71 (D.C. Cir. 1992); City of Cleveland
v. Federal Power Comm'n, 525 F.2d 845, 854 (D.C. Cir. 1976). A regulatory agency cannot
retroactively alter the cost-adjustment mechanism, nor can it reject calculations on the theory that
the method of calculation itself is not just or reasonable, because the rate rule is the filed rate. See,
e.g., ChevronTexaco, 387 F.3d at 896. However, the filed-rate doctrine does not preclude a review
based on the charge that a utility misapplied its rate. See East Tenn. Natural Gas Co. v. Federal
Energy Regulatory Comm'n, 631 F.2d 794, 800 n.10 (D.C. Cir. 1980).

 As we have explained above, the Commission's authority to conduct a retroactive
review of gas purchases does not involve retroactively changing the terms of Entex's approved rate
schedule. Instead, the Commission is attempting to review gas purchases that resulted in changes
to the amounts charged to Entex's customers under the terms of its PGA clause. The City's
underlying claim, the basis for the Commission's action, amounts to one of abuse of the PGA clause,
a variable in Entex's approved rate; the proceedings concern the alleged misapplication of Entex's
rates rather than an attempt to change the terms of the rates. In other words, the Commission's
review is not an attempt to order Entex to calculate its charges differently; rather, it would be
ordering Entex only to calculate its charges correctly. Thus, we conclude that the filed rate doctrine
does not prevent regulatory review of allegedly imprudent expenditures automatically passed through
to the ratepayers through a PGA clause. 

 Rule against retroactive ratemaking

 Finally, Entex argues that the authority to conduct a retroactive review of gas
purchases would violate the rule against retroactive ratemaking. We disagree. 

 Fundamental in the utility ratemaking process is the principle, termed the rule against
retroactive ratemaking, that utility rates are set for the future and not the past. Railroad Comm'n of
Tex. v. Lone Star Gas Co., 656 S.W.2d 421, 425 (Tex. 1983). Utilities code sections 104.110 and
104.151 codify the rule against retroactive ratemaking for gas rates. Rates set by the Commission
"constitute the legal rates of the gas utility until changed" in the manner provided by GURA. Tex.
Util. Code Ann. § 104.151(b). If, after a hearing, the Commission finds a rate unreasonable, it shall
"enter an order establishing the rates the gas utility shall charge or apply for the service in question." 
Id. § 104.110(a)(1). The new rate "shall be observed thereafter until changed." Id. § 104.110(b). 

 The rule against retroactive ratemaking is often misunderstood and misapplied. See
State v. Public Util. Comm'n of Tex., 883 S.W.2d 190, 199 (Tex. 1994) (citing Stefan Krieger, The
Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in
Public Utility Proceedings, 1991 U. Ill. L. Rev. 983, 988 (1991)). It prohibits a public utility
commission from setting future rates to allow a utility to recoup past losses or to refund to consumers
excess utility profits. Id. "Restated, the rule prohibits a utility commission from making a
retrospective inquiry to determine whether a prior rate was reasonable and imposing a surcharge
when rates were too low or a refund when rates were too high." Id. That is, the rule against
retroactive ratemaking only requires that natural gas companies, the Commission, and courts abide
by an administrative determination that a particular rate is just and reasonable. See East Tenn.
Natural Gas Co., 631 F.2d at 800. 

 The Commission's attempt to review Entex's gas purchases, which directly affected
the amounts charged to Entex's customers, and to order refunds to compensate for allegedly
imprudent purchases may well be retroactive in effect, but it is not retroactive ratemaking. As we
have already discussed, the Commission is not attempting to disturb the determination that Entex's
rate schedules are just and reasonable. Rather, the Commission's review will only concern its
application of the approved rates--having been given the benefit of including PGA clauses in its
rates, Entex will be subject to review of gas purchases to ensure that it did not misapply its filed rate
schedule. The Commission is not modifying the rate. 

 The rule against retroactive ratemaking does not prohibit the Commission from
ordering a utility to honor its rate schedule when the rate schedule itself includes a variable term. (17) 
A customer charge determined by the application of a PGA clause cannot be declared reasonable or
just until after it has been implemented. Thus, a regulatory agency can identify overcharges only
through retrospective analysis. As the D.C. Circuit explained when considering a similar problem
under the Federal Natural Gas Act, "The allegedly retroactive changes here are not retroactive at all;
they simply implement an existing rate system that requires periodic adjustments." East Tenn.
Natural Gas Co., 631 F.2d at 800 n.9; see also Concord, 955 F.2d at 75; Boston Edison Co. v.
Federal Energy Regulatory Comm'n, 856 F.2d 361, 370 (1st Cir. 1988). 

 Entex offers two cases from other states to support its argument that the power to
order refunds after conducting retroactive review of gas purchases violates the rule against
retroactive ratemaking. See Matanuska Elec. Ass'n v. Chugach Elec. Ass'n, 53 P.3d 578 (Alaska
2002); Wisconsin Power & Light Co. v. Public Serv. Comm'n of Wis., 511 N.W.2d 291 (Wis. 1994). 
Matanuska concerned a fuel surcharge included as an estimate in its rate, subject to quarterly true-up
proceedings. 53 P.3d at 581. Variances between the estimated and actual costs were taken into
account when calculating the next quarterly fuel surcharge filing. Id. Part of its fuel surcharge
estimate included a line-loss estimate to account for the amount of energy lost through the process
of generation and transmission. Id. Chugach had used a 5.219% line loss factor in its rate filings
with the regulatory agency, but later review revealed that its own internal documents showed the
actual line loss factor to be substantially lower. Id. at 582. Chugach corrected its error when filing
future tariffs but refused to issue refunds. Id. The Alaska Supreme Court held that, when initial
estimates are later shown to be inaccurate, previously set rates cannot be changed to correct for the
error. Id. at 585. It found confirmation in that approach because of the extensive review the
regulatory agency employed when setting the rate and accepting the line loss factor. Id. Chugach
does not aid our analysis here; we are not considering an estimate later found to be inaccurate, a
number that could have been verified before implementation, but the prudence of gas purchases,
which were not readily subject to review until after they occurred. 

 In dicta, the Matanuska court relied on Wisconsin Power & Light, a case that
considered fuel adjustment clauses contained in wholesale electricity rates. Id. at 586 (reviewing
Wisconsin Power & Light, 511 N.W.2d at 295-97). The Wisconsin Supreme Court held that
ordering a refund for imprudent fuel purchases violated the rule against retroactive ratemaking. 
Wisconsin Power & Light, 511 N.W.2d at 297. In part, the court found that the regulatory authority
actually had performed audits during the period subject to later review and so could not revisit its
determination in later proceedings. Id. at 296. The agency had, in fact, often approved rates on
interim bases so that it could review fuel costs and order refunds after that review. Id. As a result,
the court held that, having "approved [the utility's] rates, including the utility's expected coal costs,
14 times, the [agency] cannot now claim that the [utility] must return this money." Id. at 297. 

 Wisconsin Power & Light differs significantly from this case. Entex's PGA clause
was approved as part of its rate. As fuel costs changed, sometimes as frequently as every month,
there was no requirement to receive approval from a regulatory authority to alter the amount charged
to customers. Instead, the charges changed according to the terms of the filed rate. 

 To the extent that Wisconsin Power & Light could be interpreted broadly as
prohibiting as retroactive ratemaking in Wisconsin any refund based on a review of fuel purchase
costs passed through to customers through fuel adjustment clauses, we decline to adopt that
reasoning here. Instead, we find persuasive the dissenting opinion to that case, arguing that, because
"rates calculated under the fuel adjustment clause go into effect without advance approval by the
[regulatory agency], the utility cannot validly expect that charges thus collected are insulated from
retroactive modification." (18) Id. at 299 (Abrahamson, J., dissenting). Many other courts have reached
similar conclusions. (19) We have concluded that the proper characterization of the Commission's
review recognizes that increased consumer charges resulting from gas purchases were not products
of ratemaking. We therefore hold that they cannot be rendered inviolable by the rule against
retroactive ratemaking. (20)


 Conclusion concerning retroactive reviews of gas purchases

 After careful review of Entex's arguments, we have concluded that the Commission's
claimed authority to conduct retroactive reviews of gas purchases and to order refunds has statutory
support and does not violate either the filed rate doctrine or the rule against retroactive ratemaking. 
We overrule Entex's first issue. 


Expense reimbursement

 In its second issue, Entex argues that retroactive review of its gas purchases is not a
"ratemaking proceeding" in which the Commission could require it to reimburse the City for its costs
for participating in the review. See Tex. Util. Code Ann. § 103.022. We agree.

 "The gas utility in a ratemaking proceeding shall reimburse the governing body of the
municipality for the reasonable cost of the services of a person engaged under [the statute] to the
extent the applicable regulatory authority determines reasonable." Id. § 103.022(b). As noted above,
the utilities code defines "rate" broadly:


(A) any compensation, tariff, charge, fare, toll, rental, or classification that is directly
or indirectly demanded, observed, charged, or collected by a gas utility for a
service, product, or commodity described in the definition of gas utility in this
section; and


 (B) a rule, regulation, practice, or contract affecting the compensation, tariff, charge,
fare, toll, rental, or classification.



Id. § 101.003(12). A "proceeding" is a hearing, investigation, inquiry, or other procedure for finding
facts or making a decision under GURA. Id. § 101.003(11). The term includes a denial of relief or
dismissal of a complaint. Id. 

 Under GURA, a utility's rates may be changed in only two ways--by petition of the
utility or by a rate-setting authority, such as the Commission or the City. See id. §§ 104.102, .151. 
A proceeding that changes the amount charged customers may be a ratemaking proceeding in
circumstances where the proceeding is functionally equivalent of the procedures for notice and
hearing described in subchapters C and D of the utilities code. See Southwestern Pub. Serv. Co. v.
Public Util. Comm'n of Tex., 962 S.W.2d 207, 219-20 (Tex. App.--Austin 1998, pet. denied); see
also Tex. Util. Code Ann. §§ 104.103-.151. "[N]ot all matters that have a potential effect on rates
are ratemaking proceedings. Only matters directly resulting in changed rates constitute ratemaking
proceedings." Southwestern Pub. Serv. Co., 962 S.W.2d at 220. The requirement that a ratemaking
proceeding be the result of some sort of application to change the amount of money a utility can
charge its customers ensures "that the proceeding is one directly devoted to setting rates and is not
one peripherally related to rates." Id. at 219. 

 The City argues that the proceedings at issue in Southwestern Public Service Co., 962
S.W.2d at 217-20, are substantially identical to those at issue in this case and should entitle it to
reimbursement of its expenses. In Southwestern Public Service Co., we considered the issue of
whether fuel reconciliation proceedings in the context of electricity regulation were "ratemaking
proceedings." Id. The utility in that case sought review to reconcile its fuel expenses when its
"predetermined customer rates" resulted in over- or under-recovery of its fuel expenses. Id. at 210. 
We held that those reconciliation proceedings were the functional equivalent of ratemaking
proceedings because the actual amount of the rate was fixed in an earlier proceeding. Id. at 219-20. 
The purpose of the reconciliation proceeding, in other words, was to change the rates that had no
provision for allowing a pass-through for costs related to variations in the cost of fuel. See id. As
we have explained above, the PGA clauses in this case are an integral part of the approved rate. No
party is attempting to modify the clauses themselves, only to review compliance with the rate. Thus,
the proceedings at issue in Southwestern Public Service Co. are not similar to those we are
considering here.

 We have already concluded that the issue presented here is one concerning alleged
misapplication of Entex's approved rates, not the setting of Entex's rates. (21) The City is not seeking
to adjust the formula contained in the PGA clause or to change Entex's rates. It is merely requesting
a review of gas purchases to ensure that the customer charge complies with Entex's approved rate. 
As a result, these proceedings are not "ratemaking proceedings," and the City is not entitled to
reimbursement for its costs for its participation in the review. We sustain Entex's second issue. 


CONCLUSION

 We have concluded that the Commission has the authority to review Entex's past gas
purchases when the costs associated with those purchases were passed through to Entex's customers
through the application of the PGA clauses in Entex's filed rates and that the Commission has the
power to order refunds if it determines that Entex's gas purchases were imprudent. We have also
determined that the Commission's exercise of those powers do not violate the filed rate doctrine or
the rule against retroactive ratemaking, and we thus affirm the judgment of the district court
concerning those issues. However, we have also found that a prudence review is not a ratemaking
proceeding for purposes of utilities code section 103.022(b), and therefore the City is not entitled to
recover its expenses incurred while participating in those proceedings. Accordingly, we reverse the
judgment of the district court in part and render judgment that the City is not entitled to its expenses
under utilities code section 103.022(b).



 

 Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed in Part; Reversed and Rendered in Part

Filed: February 24, 2006









APPENDIX A


ENTEX

RATE SHEET

RESIDENTIAL SERVICE

RATE SCHEDULE NO. R-1446-2


APPLICATION OF SCHEDULE


 This schedule is applicable to customers receiving gas for uses usual in a home
through a single meter serving a single family dwelling and its related structures. Natural gas
supplied hereunder is for the individual use of the customer at one point of delivery and shall not be
resold or shared with others.


NET MONTHLY RATE


 First 400 cubic feet or less $9.19

 Next 2,600 cubic feet .6536 per 100 cubic feet

 Next 7,000 cubic feet .5412 per 100 cubic feet

 Over 10,000 cubic feet .5208 per 100 cubic feet


MINIMUM MONTHLY BILL $9.19


PAYMENT


 Bills shall be rendered on a monthly basis and are due and payable within ten (10)
days from the date of bill.


PURCHASED GAS ADJUSTMENT PROVISION


 The above net monthly rate per unit sold is predicated upon a price of natural gas
purchased for resale hereunder of $4.5705 per Mcf. To the extent that ENTEX's price of natural gas
to be purchased (adjusted to correct any prior variations from actual costs) for resale hereunder
increases or decreases, said net monthly rate shall be adjusted up or down to reflect (i) changes in
such cost of gas per unit sold and (ii) changes in gross receipts taxes resulting from such increases
or decreases in the net monthly rate. For purposes of calculating said adjustment, it shall be proper
for ENTEX to determine its cost of gas from its several suppliers and the gross receipts taxes to be
paid on the basis of a logical geographical area.


 If ENTEX receives any refunds of any increased cost of purchased gas that have been
passed on under this provision, a refund shall be made to customers served by this rate schedule.
1. The State of Texas, separately from the Commission, intervened in this case and is
represented by the consumer protection and public health division of the Office of the Attorney
General. Hon. Elizabeth Ames Jones is successor in office to Hon. Charles R. Matthews, originally
a party to this suit in his official capacity as a commissioner of the railroad commission. We have
substituted Jones for Matthews as a party to this suit. See Tex. R. App. P. 7.2(a). 
2. We refer to this entity as Entex, as it was known during the relevant events from which this
appeal arose. 
3. Cities have exclusive original jurisdiction over natural gas rates in areas within the
municipality while the Commission has the same over rates in areas outside of municipalities. See
Tex. Util. Code Ann. §§ 102.001(a)(1)(A) & 103.001 (West Supp. 2005). A municipality can
surrender its authority to the Commission. Id. §§ 102.001(a)(1)(B), 103.001, 103.003. 


 We have reproduced an example of one of the City-approved rate schedules at Appendix
A.
4. We will discuss the nature of PGA clauses in more detail when we consider Entex's
appellate issues.
5. On January 8, 2003, the City, by ordinance, surrendered to the Commission its claimed
jurisdiction over the matter. See Tex. Util. Code Ann. § 103.003 (West Supp. 2005). 
6. The Commission's hearing examiners characterized the parties' positions thus: "Generally,
the City of Tyler, on the one hand, argues that the proceeding includes a 'prudence review' of past
purchases. On the other hand, Entex argues that the Commission lacks the authority to conduct a
retroactive prudence review and that this case is limited to an audit of its gas costs flow through."
(Footnotes omitted.). 
7. Commissioner Michael Williams dissented.
8. After filing its petition in district court, Entex filed a petition for writ of mandamus
requesting that this Court stay the Commission from engaging in its prudence review of Entex's gas
purchases during the pendency of this appeal. We denied the petition. The parties report that the
Commission has conducted its review, found that no refund was due, and severed from that
proceeding the issue of the City's claim for rate case expense reimbursement. The Commission later
denied the City reimbursement in the severed cause. Because this appeal continues to present live
issues affecting matters still pending before the Commission, we proceed to consider them. 
9. We do so while mindful of the admonition that a "lawyer who attempts to chop his way
around in the jungle of legal opinion on the subject of these [PGA] clauses is apt to find himself
wandering in circles with his intellectual machete so dulled he is soon brought to a standstill." Philip
P. Ardery, Should There Be Rules about Escalator Clauses?, 53:1 Pub. Util. Fort. 35, 39 (1954).
10. In the sample rate schedule reproduced as Appendix A, fixed-cost and variable-cost
portions of the schedule are reported together under the heading "Net Monthly Rate." Some courts
have termed these numbers as the "base rate," which fluctuates based on changes in the gas-cost
variable as described in the PGA clause. See, e.g., Southern Cal. Edison Co. v. Public Util. Comm'n,
576 P.2d 945, 954-55 (Cal. 1978). 
11. Pierce has asserted that escalator clauses, such as the PGA clauses in this case, "are
essential to the financial viability of many pipelines and other utilities." Richard J. Pierce,
Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry, 97 Harv. L.
Rev. 345, 373 (1983). Nonetheless, criticism has been voiced against the use of such clauses
because of their automatic nature. See G. William Fowler, Purchased Gas Adjustment Clauses: An
Adjuster's Viewpoint, 6 St. Mary's L.J. 567, 578-81 (1974) (reviewing major areas of criticism of
fuel adjustment clauses, including incentive issues and parent-subsidiary self-dealing
considerations). 
12. "Regulatory lag" is the loss of earnings between the time a utility files a petition for a rate
increase and when the rate relief actually becomes effective. Pierce, 97 Harv. L. Rev. at 360; see
R.S. Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U. Pa. L. Rev. 964, 964 (1958); 
see also Elizabeth Warren, Regulated Industries' Automatic Cost of Service Adjustment Clauses: Do
They Increase or Decrease Cost to the Consumer?, 55 Notre Dame L. Rev. 333, 348 (1980)
("Regulatory lag simply operates as a squeeze on the utility."). 
13. Four pragmatic justifications have generally been identified for using such clauses:


(1) to reduce the number of rate proceedings and the expenses attended thereon,
(2) a series of smaller increases to the consumer, (3) improved financial
stability for the utility by reducing the variations in earnings caused by such
increase in expenses, and as a result (4) a somewhat reduced cost of capital
which ultimately would accrue to the benefit of the consumer.


Patricia Gabel, et al., Utility Rates, Consumers, and the New York State Public Service Commission,
39 Alb. L. Rev. 707, 754 (1975); see Daily Advertiser v. Trans-La, Div. of Atmos Energy Corp., 612
So. 2d 7, 22 n.23 (La. 1993); see also Railroad Comm'n of Tex. v. City of Fort Worth, 576 S.W.2d
899, 902 (Tex. Civ. App.--Austin 1979, writ ref'd n.r.e.) (citing Montana Consumer Counsel v.
Public Serv. Comm'n, 541 P.2d 770 (Mont. 1975)); Fowler, 6 St. Mary's L.J. at 578.
14. For the sake of simplicity, we refer only to the terms and numbers used in the sample rate
schedule reproduced at Appendix A. 
15. The price of gas is divided into four brackets: for the first 400 cubic feet of gas, the
customer is charged a set price of $9.19 (the minimum monthly bill); the next 2,600 cubic feet cost
$.6536 per 100 cubic feet; the next 7,000 cubic feet cost $.5412 per 100 cubic feet; and, finally, any
amount of gas more than the initial 10,000 cubic feet will cost the customer $.5208 per 100 cubic
feet. 
16. The PGA clause also includes a provision for the amount charged to vary according to
changes in gross receipts taxes, a practice that has been common in jurisdictions that permit the use
of PGA clauses. See Trigg, 106 U. Pa. L. Rev. at 982-87.
17. The rule against retroactive ratemaking generally protects the utility from being subject
to later decisions by a regulatory agency that the agency's earlier decision in approving a rate was
"unsound." See Public Util. Comm'n of Cal. v. Federal Energy Regulatory Comm'n, 894 F.2d 1372,
1383 (D.C. Cir. 1990). In the context of PGA clauses, this reasoning cannot apply--no regulatory
authority has ever considered the circumstances under which Entex made its gas purchases. 
18. As the Rhode Island Supreme Court has observed, the "specter of retroactive ratemaking
must not be viewed as a talismanic inhibition against the application of principles based upon equity
and common sense." Roberts v. Narragansett Elec. Co., 470 A.2d 215, 217 (R.I. 1984))
19. See Fitchburg Gas & Elec. Light Co. v. Department of Telecomms. & Energy, 801 N.E.2d
220, 230-31 (Mass. 2004); Daily Advertiser v. Trans-La, Div. of Atmos Energy Corp., 612 So. 2d
7, 23 (La. 1993); MGTC Inc. v. Public Serv. Comm'n of Wyo., 735 P.2d 103, 107 (Wyo. 1987); 
Equitable Gas Co. v. Pennsylvania Pub. Util. Comm'n, 526 A.2d 823, 830-31 (Pa. Commw. Ct.
1987); Gulf Power Co. v. Florida Pub. Serv. Comm'n, 487 So. 2d 1036, 1037 (Fla. 1986); Public
Serv. Comm'n of Md. v. Delmarva Power & Light Co., 400 A.2d 1147, 1153 (Md. Ct. Spec. App.
1979); Southern Cal. Edison Co. v. Public Util. Comm'n, 576 P.2d 945, 954-55 (Cal. 1978).
20. Entex appears to make an additional argument--that the period to be subject to review is
not limited in a way that will pass constitutional muster as an exception to the rule against retroactive
ratemaking. See Tex. Const. art. I, § 16; Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,
615 S.W.2d 947, 956-57 (Tex. App.--Austin 1981), writ ref'd n.r.e., 622 S.W.2d 82 (Tex. 1981). 
But see Fitchburg Gas & Elec. Light Co., 801 N.E.2d at 232 (rejecting similar argument under the
United States and Massachusetts constitutions). We emphasize that our holding here is that the rule
does not apply to retroactive review of gas purchase costs under a PGA clause. The Commission's
review is therefore not an "exception" to the rule. 
21. The City's petition to the Commission to engage in retroactive review of Entex's gas
purchases reflects this distinction. The City did not cede its jurisdiction to set rates. Instead, it
alleged only that (1) Entex's gas purchases were unreasonable; (2) Entex's allocation of purchased
gas discriminated against residential and small commercial customers; (3) its tariffs were false and
misleading (but did not request that new rates be set); and (4) the PGA clause included improper
charges.